# UNITED STATES DISTRICT COURT

# DISTRICT OF HAWAIʻI

| | |
|---|---|
| DAIRY ROAD PARTNERS and GLENN NAKAMURA,<br><br>        Plaintiffs,<br><br>    vs.<br><br>MAUI GAS VENTURES LLC and PAUL CHENG,<br><br>        Defendants. | CIV. NO. 16-00611 DKW-KJM<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS REFILED FIRST AMENDED COMPLAINT** |

Dairy Road and Nakamura initiated this action on November 16, 2016. *See* Compl., Dkt. No. 1. On July 20, 2017, they filed what they termed a "Refiled" First Amended Complaint ("Second Amended Complaint" or "SAC"; Dkt. No. 40). Through the SAC, Plaintiffs seek monetary damages and equitable relief arising out of an alleged, fraudulently procured loan agreement with Maui Gas and Cheng.

For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss the SAC. MTD, Dkt. No. 41. Count I of the SAC is hereby DISMISSED WITHOUT PREJUDICE while all other counts are DISMISSED WITH PREJUDICE.

# BACKGROUND

On or about December 9, 2009, American Savings Bank, F.S.B. ("ASB") extended a $1,384,213 commercial loan to Dairy Road ("ASB Loan") that was guaranteed by Nakamura, Dairy Roads' General Partner. SAC ¶ 8, Dkt. No. 40. The ASB Loan granted ASB a lien and security interest in the property located at 380 Dairy Road, Kahului, Maui, Hawaii, Tax Map Key (2) 3-8-65-27 ("Subject Property").[1] SAC ¶¶ 4, 8, Dkt. No. 40.

On March 3, 2013, after Dairy Road fell behind on its mortgage payments under the ASB Loan, ASB filed for foreclosure in the Second Circuit Court of the State of Hawaii, Civil No. 13-1-0283(3) ("Foreclosure Action"). SAC ¶ 12, Dkt. No. 40. Dairy Road also filed for Chapter 11 bankruptcy around that time. SAC ¶ 13 (stating that the eventual dismissal of the bankruptcy case delayed proceedings in the Foreclosure Action until December 24, 2014).

*Cheng's Interest in the Subject Property*

While the Foreclosure Action was pending, Cheng—a "self-proclaimed investor from Texas" (Mem. in Opp'n at 2, Dkt. No. 45) who is the "principal and controlling person" of Maui Gas (SAC ¶ 7, Dkt. No. 40)—allegedly approached Nakamura for advice regarding his "interest in investing in commercial properties

---

[1]"The Subject Property is income producing, and its industrial uses include warehousing, general office use, a service station and convenience store, and retail sale of gasoline, motor fuels, and sundries, some of which is subleased by [Dairy Road]." SAC ¶ 9, Dkt. No. 40.

in Hawaii." SAC ¶ 11, Dkt. No. 40. Apparently, the two became friends, Nakamura "acquaint[ed] Cheng with the Subject Property," and based on Cheng's "promises that Cheng and [Maui Gas] could financially assist" Plaintiffs with their defaulted ASB Loan, Cheng, Nakamura and ASB began to negotiate a deal. SAC ¶¶ 11, Dkt. No. 40.[2]

Cheng represented to Nakamura and others "that Cheng was going to buy the ASB Loan on [Plaintiffs'] behalf to help [Dairy Road] gain some time to refinance or sell" (SAC ¶ 16) and to stop the Foreclosure Action (SAC ¶ 14). As discussed further below, in consideration for what Plaintiffs characterize as Cheng's offer to give Plaintiffs a chance to repay the note within a certain period of time, Cheng sought guaranteed rent proceeds from the various leases of the Subject Property, together with remediation of identified contamination on the property by Plaintiffs. Towards these ends, on September 9, 2014, Cheng emailed Nakamura's son, Garth:

> Let's work on Dairy Road. Get me bank contact. Get me ESA report on contamination. I will just cold call the bank and say I want to buy the note.

---

[2]The Court has attempted to summarize the salient points associated with this negotiation process in light of Plaintiffs' decision to attach several hundred pages of email correspondence to the SAC. These several hundred pages of emails comprise Exhibit 7 to the SAC, which is split into four parts spanning overlapping time periods. *See* Ex. 7.1, Dkt. No. 40-8 (including emails dated Sept. 23, 2014 to Dec. 23, 2014); Ex. 7.2, Dkt. No. 40-9 (emails from Dec. 11 to Dec. 29, 2014); Ex. 7.3, Dkt. No. 40-10 (emails from Sept. 9 to Dec. 24, 2014); and Ex. 7.4, Dkt. No. 40-11 (emails from Sept. 18, 2014 to Dec. 11, 2014).

SAC, Ex. 7.3 at 33, Dkt. No. 40-10.  On September 17, 2014, Chuck Choi, Dairy Road's attorney, provided a copy of the complaint in the Foreclosure Action to Cheng.  SAC, Ex. 7.3 at 36, Dkt. No. 40-10.  Choi also asked Cheng to send a written proposal directly to ASB's attorney, Wayne Mau, and suggested specific language for him to do so:

> I understand that [ASB] has a foreclosure case pending against Dairy Road Partners in Maui Circuit Court.  However, I also understand that Dairy Road Partners' underground storage tanks have discharge issues that could cost Dairy Road or any other potentially responsible party significant sums to remediate.  Nevertheless, I am willing to purchase the bank's Note, Mortgage and related loan documents for $400,000, which is approximately 30% of the outstanding principal balance due on the loan.  If an agreement is reached and documented, I could close the transaction within a week or two.

SAC, Ex. 7.3 at 35–36 [Choi emails dated Sept. 17 and 18, 2014], Dkt. No. 40-10.

### Cheng's Offer to Purchase the ASB Loan

On September 20, 2014, Cheng emailed a $300,000 purchase price proposal to ASB, with a copy to Choi.  SAC ¶¶ 14–15, Dkt. No. 40; SAC, Ex. 7.4 at 5–8, Dkt. No 40-11).  When no response from the bank was immediately received, Choi contacted ASB's attorney on September 26, 2014 and was told "that the bank wanted to review its environmental consultant's written report, which is expected next week[,]" before responding.  *See* SAC, Ex. 7.1 at 5, Dkt. No. 40-8.  By October 6, 2014, the negotiations were in the same posture, with ASB still

considering the environmental reports on the Subject Property[3] before "putting together a formal written response to Mr. Cheng." SAC, Ex. 7.1 at 11, Dkt. No. 40-8.

A week later, ASB submitted a counter-offer (*see* SAC, Ex. 7.1 at 22, Dkt. No. 40-8 (writing, "I understand the bank countered Paul Cheng")), and on October 15, 2014, Cheng contacted Choi asking for "an exact list of collateral securing the Dairy Road Note to ASB," and for various related financial statements and "underlying ground leases" (SAC, Ex. 7.1 at 21, Dkt. No. 40-8). At the same time, Choi made his own request, asking ASB for "a copy of Mr. Nakamura's report so that he can consider the bank's counter offer." SAC, Ex. 7.1 at 22, Dkt. No. 40-8.[4]

On October 15, 2014, Cheng emailed Choi a second time. Cheng reminded Choi that "health dept sign off" on remediation of the property was necessary "before I close" (SAC, Ex. 7.1 at 23, Dkt. No. 40-8) and that "I will insist on a lockbox control receipts account structure so I make sure I get monthly [rent] payments" (SAC, Ex. 7.4 at 12, Dkt. No. 40-11). Cheng followed up with Garth Nakamura the next day to find out "what is the best [Plaintiffs] are able to pay on

---

[3]Choi requested a copy of the environmental reports from ASB. SAC, Ex. 7.1 at 15, Dkt. No. 40-8.

[4]ASB declined to provide its internal reports to Choi and further stated that because the proposed sale would be between ASB and Cheng, ASB intended to deal directly with Cheng. SAC, Ex. 7.1 at 24, Dkt. No. 40-8.

the deal so [Cheng] can get back to ASB." SAC, Ex. 7.4 at 13, Dkt. No. 40-11.

Cheng's message included the following deal summary:

> The general concept I am willing to do is as follows:
>
> $15,000 to $20,000 a month depending on how much I have to pay for the note.
>
> Minimum term 4 years before buyout can take place.
>
> Collateral control in "lockbox" style banking arrangement of rent receipt from Savers and gas receipts up to the monthly amount. This entails depositing automatically all receipts monthly to the lock box and then after I get my monthly, I release automatically all other amounts above that back to you/operator.
>
> Buy back from me any time after 4 years for my original purchase price from ASB be it X or $750,000.
>
> Otherwise, the deal just goes on for the rest of the length of the land lease.
>
> Please advise as to your continuing interest.

SAC, Ex. 7.4 at 13, Dkt. No. 40-11. Although the SAC contains no evidence of a specific response from Plaintiffs, Garth Nakamura subsequently began communicating with a Department of Health official regarding an underground storage tank precision test. *See, e.g.*, SAC, Ex. 7.4 at 23–24; Dkt. No. 40-11.

### *Cheng's Acceptance of ASB Counter-Offer*

On October 29, 2014, Cheng successfully purchased the ASB Loan, announcing to Plaintiffs that, "ASB accepted my offer—$400k," and "We are

6

ON." SAC, Ex. 7.4 at 15, Dkt. No. 40-11.[5] Cheng offered Choi a few additional

details:

> Ok. [ASB's attorney] is going to brief me on the collateral package and where the civil litigation stands. Let me get my feet on the ground on his legal package and then we can have a conference call with you[, Nakamura,] and Garth to see how we can move the game forward.
>
> I told [Nakamura] to hurry up now and ... get the environmental issue resolved be it $80k to clean up the test wells or whatever.

SAC, Ex. 7.4 at 16–17, Dkt. No. 40-11.[6]

### *Loan Modification Negotiations*

Upon concluding negotiations with ASB over the loan purchase, Cheng

turned to negotiating a loan modification with Dairy Road. As part of that process,

he introduced Choi to both Alice Wong, his partner in Texas, and Anthony

---

[5]Although Cheng's original offer to ASB, dated September 20, 2014, was for $300,000 (*see* SAC, Ex. 7.3 at 40, Dkt. No. 40-10), $400,000 was the ultimate purchase price (*see* SAC, Ex. 7.4 at 15, Dkt. No. 40-11). Aside from a reference to ASB's October 15, 2014 counteroffer in an email from Choi to ASB's attorney (SAC, Ex. 7.1 at 22, Dkt. No. 40-8), the SAC contains no other history explaining the $100,000 price difference.

[6]Cheng posed three additional questions to Plaintiffs at the end of this October 29, 2014 email regarding (A) whether Plaintiffs would have the "capital to pay for the $80k clean up,"
(B) whether they had the capital "to do a $100k renovation of the store interior," and (C) when Plaintiffs expected to "buy out their partners." SAC, Ex. 7.4 at 16–17, Dkt. No. 40-11. Choi answered that (A) "Clean-up costs: the State needs to approve the vendor's proposal[,] but [Nakamura] informs me that [Dairy Road] can borrow the money to fund this";
(B) "Renovations: [Nakamura] may need to borrow money for this[;] [h]e indicated forming a partnership with you"; and (C) "Settlement: I thought we had an agreement but Yamashitas are now asking for releases which is something [Nakamura] is not willing to give without access to financial information." SAC, Ex. 7.1 at 31, Dkt No. 40-8.

Barbieri, his attorney.  SAC, Ex. 7.1 at 31, Dkt. No. 40-8; *see also* SAC ¶ 32, Dkt.

No. 40 (referring to Wong as Cheng's Texas "accountant"); SAC, Ex. 7.4 at 25,

Dkt. No. 40-11.  Cheng requested "a bunch of documents from [Plaintiffs] at their

earliest convenience," to be forwarded to Barbieri and Wong, who would "be

calling Choi to go over all the facts and . . . structures" (SAC, Ex. 7.1 at 31, Dkt.

No. 40-8), including:

1. Land Lease from HRT and all amendments
2. Lease of C store and office to Waiehu Partners and amendments if any
3. Antenna Lease and all amendments
4. Savers Lease and all amendments
5. Gasoline Excise Taxes owed recap and correspondences with State
6. Insurance Policy and all correspondences on Environmental Issues
7. Property and Casualty liability Insurance policy on C store and improvements in place
8. Buyout Agreement from Junior Partners
9. Operating Plan from [Nakamura]/Garth going forward and financial proposal for us

(SAC, Ex. 7.4 at 25, Dkt. No. 40-11).  On November 10, 2014, Cheng followed up

with Garth Nakamura, indicating that the following items were still outstanding:

1. your proforma going forward
2. buyout of your partners
3. regaining control of the C Store
4. tank pressure test
5. final environmental cleanup cost estimate and funding process
6. cap ex budget on updating C store
7. Savers building lease extension'
8. Outstanding Land lease payments—NEED RECAP

9.     Outstanding bank escrow on #8 above—NEED RECAP

SAC, Ex. 7.1 at 57, Dkt. No. 40-8.  On November 17, 2014, Wong requested five

additional documents from Garth Nakamura, including: "Rent roll," "All tenant

leases and amendments," "Security deposit schedule," "Current insurance

policies," and "Mortgage Tax payment status, if applicable."  SAC, Ex. 7.1 at 61,

Dkt. No. 40-8.

On November 18, 2014, Cheng wrote an email to Garth Nakamura entitled,

"Proposal to Glenn Nakamura—Dairy Road Ventures Maui Gas Station":

> Need a plan for:
>
> Remediation costs.  I need to know you are all going to perform
> the necessary remediation whatever the test results next month
> specifies.
>
> C-Store remodel.  I need to know that you guys are going to
> remodel the store so that you can compete.
>
> Status: Buyout of [Dairy Road.]

SAC, Ex. 7.4 at 33, Dkt. No. 40-11.  At the same time, as a "Counter back to

[Plaintiffs]," Cheng offered to "Keep present note—we remain as lender only[,]"

apparently without any modification, or to "Revise Terms of Note" according to a

detailed plan appearing therein.  *See* SAC, Ex. 7.4 at 34–39 [Revision Plan], Dkt.

No. 40-11.  The next day, Cheng offered additional ideas on how to structure any

modification: "[w]e can raise the buyback price, apply some of the upfront

payments towards the buyback and end up in the same place" and solicited from

Dairy Road other "good ideas to make us both comfortable." SAC, Ex. 7.4 at 40–41, Dkt. No. 40-11.

On November 24, 2014, Dairy Road indicated that it was taking Cheng's advice to heart. Garth Nakamura advised that Plaintiffs were "trying to work on our numbers and also trying to put together a creative solution that will be in the best interest for both parties." SAC, Ex. 7.4 at 42–43, Dkt. No. 40-11. Cheng responded enthusiastically: "Everything is open to discussion. I am not a one concept guy. Give just me something that makes sense and we will do it. Mahalo… Tell [Nakamura] don't think I am not a friend, etc., Just want to understand the margins of the deal." SAC, Ex. 7.4 at 48, Dkt. No. 40-11.

The parties continued to exchange details and other information via email over the next few weeks, and when Garth shared with Cheng "a future project [his] father [(Nakamura) was] looking into that includes a gas station, c-store, fast food," Cheng responded: "Let's get our deal done first." SAC, Ex. 7.4 at 48, Dkt. No. 40-11.

As of December 10, 2014, Plaintiffs acknowledge that "Cheng was still offering [Dairy Road at least] three options":

Chuck,

I met with my partners and we are amenable to the following options:

If you do not want to make a deal, we will go immediately to foreclosure. We will sell to the highest bidder at the auction. If no

one comes, then we will keep it and hire someone to run the operations.

If you do want to make a deal, we offer the following 3 Options:

Option 1: 12 months and we give you a one time 30 day window to buy us out at the 12th month for $500,000. Monthly payment is: $7,500.00 per month in the interim. Buyout price is at $500,000.00.

Option 2: 24 months and we give you a one time 30 day window to buy us out at the 24th month. Monthly payment is $7,500 for the first 12 months, and then $9,000 per month for the 2nd twelve months, Buyout price is at $560,000.00.

Option 3: 36 months and we give you a one time 30 day window to buy us out at the 36th month. Monthly payment is $7,500 for the first 12 months, and then $9,000 per month for the 2nd twelve months and $11,000 per month for the third twelve months, Buyout price is at $620,000.00 at the 36th month window.

After 36 months, if no buyout takes place, we will foreclose but we will always entertain an offer to extend the lease.

Buyout price is the same for each 12 month period whether you pay us off at the first or the last month of each 12 month period.

Nakamura to remediate immediately and or obtain clean Health Department permit to operate.

No financing allowed on any of the leasehold properties or against any leases during the time of lease.

Paul Cheng

SAC, Ex. 7.4 at 50–51, Dkt. No. 40-11 [hereinafter Options Email]; SAC ¶ 25, Dkt. No. 40; *see also* SAC, Ex. 7.4 at 50, Dkt. No. 40-11 (forwarding Options Email to Garth Nakamura).

On December 11, 2014, Cheng elaborated on the alternatives he had proposed the previous day:

> Here are some of the non-monetary terms we need on the deal with [Nakamura]:
>
> He and his partners and the purchasing entity takes on all liability and indemnifies us from any and all issues including retribution from ASB upon purchase.
>
> He produces a Health Department permit to continue to operate the gas station within 45 days from December 15, 2014 or begins fully funded remediation within 30 days from December 15.
>
> He starts renovation of the store with a fully funded budget, plans we approve asap but not later than 60 days after December 15, 2014[.]
>
> If he fails to do any or all of the above, he can still buy us out at whatever price we allow him on the proposal before us but he will have to do so within 15 days from the last default date from items 1, 2 or 3 above or we foreclose and he voluntarily agrees to a friendly foreclosure and deeds the properties to us.

SAC, Ex. 7.4 at 54, Dkt. No. 40-11. Several days later, on December 15, 2014, Choi responded with a draft proposal or term sheet of his own. *See* SAC, Ex. 7.1 at 70–72, Dkt. No. 40-8. On December 19, 2014, Choi followed up with Cheng stating, "I think the ball is in your court?" SAC, Ex. 7.1 at 76, Dkt. No. 40-8.

On December 23, 2014, apparently following several telephone conversations between the principals, Choi circulated what he referred to as a "proposed final term sheet." SAC, Ex. 7.4 at 57–58, Dkt. No. 40-11. In response, Cheng told Choi to "[w]ork it out with Tony Barbieri," because "[w]e are not

closing the deal unless he's satisfied with the details." SAC, Ex. 7.4 at 57, Dkt. No. 40-11. Barbieri subsequently wrote to Choi with "[a] few things, all of which we need to get worked out before the loan modification agreement goes into effect." SAC, Ex. 7.2 at 9, Dkt. No. 40-9. Those "things" included several estoppel agreements to be executed by the Borrower, Guarantor and subtenants, "a Reconciliation of all outstanding rents in escrow and rents not paid from all the subtenants," and/or "documentation . . . that all rents are current." SAC, Ex. 7.2 at 9, Dkt. No. 40-9. Notwithstanding these outstanding items, Barbieri sent a draft loan modification agreement to Choi on December 24, 2014. SAC, Ex. 7.2 at 20, Dkt. No. 40-9 (referring to the "First Loan Modification Agreement," Dkt. No. 40-9 at 23–40).

Over the next several days, the parties, led by Barbieri and Choi, continued to negotiate and discuss the terms of the loan modification agreement. *See e.g.* SAC, Ex. 7.4 at 71–73, Dkt. No. 40-11; SAC, Ex. 7.2 at 46–48, Dkt. No. 40-9. Among other things, Choi wrote to Barbieri on December 29, 2014 with the following request: "I know this is a moot point, but could I get a copy of the option (to satisfy my client's curiosity)." SAC, Ex. 7.2 at 53–54, Dkt. No. 40-9. In response, Barbieri asked, "What option?" SAC, Ex. 7.2 at 53, Dkt. No. 40-9. Choi answered, "The agreement whereby ASB agreed to sell the paper to [Cheng]." SAC, Ex. 7.2 at 53, Dkt. No. 40-9. To which Barbieri responded: "Unfortunately

that document is subject to various confidentiality provisions so I cannot disclose it to you at this time. And besides, as you already pointed out, it is a moot point." SAC, Ex. 7.2 at 53, Dkt. No. 40-9.

The next day, regarding upcoming rent payments that were to be made directly to Cheng, Barbieri informed Choi, "We sent letters to all the subtenants." SAC, Ex. 7.3 at 6, Dkt. No. 40-10. Choi responded with some concern regarding the consequences of subtenant rents going to the new lender on "the borrower's ability to operate its business." SAC, Ex. 7.3 at 15, Dkt. No. 40-10. And Barbieri then asked Choi, "[w]hat business does Dairy Road have aside from owing [sic] the property?" before inviting Choi to call him the following day. SAC, Ex. 7.3 at 15, Dkt. No. 40-10.

At some point shortly thereafter, negotiations over the loan modification agreement ceased.[7] That is evident because, on January 12, 2015, Cheng's attorney contacted the court in the Foreclosure Action and advised that Maui Gas was the "new owner of the ASB Loan" and would presumably be substituting in place of ASB as plaintiff. SAC ¶ 29, Dkt. No. 40. Moreover, "on May 14, 2015, [Maui Gas] filed for summary judgment against [Dairy Road] and against Nakamura for the entire principal loan balance as well as an immediate money

---

[7]The correspondence that Plaintiffs included in Exhibit 7 to the SAC ends with emails between Barbieri and subtenants of the Subject Property. *See, e.g.*, SAC, Ex. 7.3 at 29–30, Dkt. No. 40-10. The exhibits offer no further insight into the negotiations or the reasons why the loan modification agreement was never executed.

judgment against Nakamura [as Guarantor], subsequently awarded in the amount of $1,270,933.79."  SAC ¶ 30, Dkt. No. 40.

*Procedural History*

Plaintiffs initiated the instant lawsuit on November 16, 2016.  Compl., Dkt. No. 1.  Defendants filed a joint Motion to Dismiss on April 10, 2017.  *See* Dkt. No. 21.  On May 22, 2017, in addition to filing their Memorandum in Opposition (Dkt No. 27) to the April 10, 2017 motion, Plaintiffs filed a "First Amended Complaint" (Dkt. No. 28) without leave of court, followed by a belated Ex Parte Motion for Leave to File First Amended Complaint on May 23, 2017 (Dkt. No. 29).  After a June 19, 2017 Rule 16 Scheduling Conference before the Magistrate Judge (*see* EP, Dkt. No. 37), the Magistrate Judge denied the Ex Parte Motion (Dkt. No. 36).

On July 6, 2017, the Magistrate Judge signed a Stipulation Regarding First Amended Complaint and Order (Dkt. No. 39), in which the parties agreed that the May 22, 2017 complaint would "be deemed withdrawn without prejudice." Pursuant to the same Stipulation and Order, Plaintiffs then filed another amended complaint, which they styled as a "Refiled First Amended Complaint," hereinafter referred to as the "SAC."  SAC, Dkt. No. 40.  The SAC asserts five claims for relief: Fraud or Misrepresentation ("Count I"; SAC ¶ 34); Breach of Contract ("Count II"; SAC ¶¶ 35–36); Promissory Estoppel ("Count III"; SAC ¶¶ 37–38);

Specific Performance of the buy-back agreement with Cheng ("Count IV"; SAC ¶¶ 39–40); and Breach of Fiduciary Duty ("Count V"; SAC ¶¶ 41–42).[8]

Defendants filed their Motion to Dismiss ("MTD") the SAC on August 21, 2017. MTD, Dkt. No. 41. Plaintiffs opposed the MTD on September 28, 2017 (Opp'n, Dkt. No. 45), to which Defendants replied on October 5, 2017 (Reply in Supp., Dkt. No. 46). The parties appeared before this Court at a hearing on the MTD on November 16, 2017. *See* EP, Dkt. No. 48. The Court took matters under advisement, and the instant disposition follows.

## LEGAL STANDARDS

*Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)*

A motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) challenges a complaint's compliance with the pleading requirements of the Federal Rules.

The Court may dismiss a complaint under the rule for "failure to state a claim upon which relief can be granted" when there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In other words,

---

[8]Plaintiffs apparently sought leave to file these claims, or reasonable facsimiles, as counterclaims in the Foreclosure Action, but their motion was denied by the state court judge without prejudice. SAC ¶ 31, Dkt. No. 40.

plaintiffs are required to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Factual allegations that only permit the Court to infer "the mere possibility of misconduct" do not constitute a short and plain statement of the claim showing that the pleader is entitled to relief as required by FRCP 8(a)(2). *Id.* at 677, 679 (explaining that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

Courts considering a motion under Rule 12(b)(6) are generally limited to reviewing the contents of the complaint. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). If matters outside the pleadings are considered, the Rule 12(b)(6) motion is treated as one for summary judgment. *See Keams v. Tempe Tech. Inst., Inc.*, 110 F.3d 44, 46 (9th Cir. 1997); *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). Courts may, however, "consider certain materials—documents

attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Documents whose contents are alleged in a complaint and whose authenticity is not questioned by any party may also be considered in ruling on a Rule 12(b)(6) motion. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Heartland Payment Sys., Inc. v. Central Pac. Bank*, 2012 WL 488107, *2 (D. Haw. Feb. 13, 2012).

For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (explaining that the construed-as-true/light-most-favorable tenet "is inapplicable to legal conclusions"); *Sprewell*, 266 F.3d at 988; *see also Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . , a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)).

Moreover, the court need not accept as true allegations that contradict matters properly subject to judicial notice, nor must it assume that allegations contradicted by the exhibits attached to the complaint are true. *Sprewell*, 266 F.3d at 988. Rather, the Ninth Circuit has explained, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

*Motion to Dismiss Count I Under FRCP 9(b)*

Claims sounding in fraud must also satisfy FRCP Rule 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake" and provides that "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." "[C]ircumstances must be alleged with enough specificity "to give defendants notice of the particular misconduct . . . so they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 U.S. F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted)). To that end, Rule 9(b) demands detailed allegations setting forth "the time, place, and nature of the alleged fraudulent activities." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *see also Illinois Nat'l Ins. Co. v. Nordic PCL Const., Inc.*, 870 F. Supp. 2d 1015, 1036–37 (D. Haw. 2012) (explaining that allegations of fraud "must be accompanied by 'the

who, what, when, where, and how' of the misconduct charged") (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). "[M]ere conclusory allegations of fraud are insufficient." *Moore*, 885 F.2d at 540.

"Because a dismissal of a complaint or claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner." *Vess*, 317 F.3d at 1107.

*Leave to Amend*

Under Rule 15(a)(2) of the FRCP, leave to amend a party's pleading "should [be] freely give[n] . . . when justice so requires." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (explaining that "the underlying purpose of [FRCP] Rule 15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities") (quoting *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987)). Further, the Ninth Circuit has explained that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962); *Erlich v. Glasner*, 352 F.2d 119, 122 (9th Cir. 1965)). Nonetheless, leave to amend may be denied for "undue delay, bad faith or dilatory motive on the part of

the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Mayes v. Leipziger*, 729 F.2d 605, 608 (9th Cir. 1984) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## **DISCUSSION**

For the reasons set forth below, the Motion to Dismiss is GRANTED. Counts II–V are DISMISSED WITH PREJUDICE. However, because facts *may* exist that would allow Plaintiffs' fraud claims to proceed, Count I is DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND.

I. **Fraud/Misrepresentation** (Count I)

"[F]raud in the inducement is fraud which induces the transaction by misrepresentation of motivating factors such as value, or extent, usefulness, age, or other characteristic of the property." *Schmidt v. Fid. Nat'l Title Ins. Co.*, 2009 WL 10676787, *12 (D. Haw. Sept. 30, 2009) (quoting *Adair v. Hustace*, 640 P.2d 294, 299 (Haw. 1982), *abrogated by Ass'n of Apt. Owners of Royal Aloha v. Certified Mgmt., Inc.*, 386 P.3d 866 (Haw. 2016), *as amended*) (internal brackets omitted). In Hawaiʻi, a party claiming fraud must establish four elements: "(1) false representations were made by defendants, (2) with knowledge of their falsity . . . , (3) in contemplation of plaintiff's reliance [thereon], and (4) plaintiff did rely on them." *Shoppe v. Gucci Am., Inc.*, 14 P.3d 1049, 1067 (Haw. 2000) (quoting *TSA*

*Int'l, Ltd. v. Shimizu Corp.*, 990 P.2d 713, 725 (Haw. 1999), *as amended*). The party claiming fraud bears the burden to "establish these elements by clear and convincing evidence." *TSA Int'l*, 990 P.2d at 725 (quoting *Hawaii's Thousand Friends v. Anderson*, 768 P.2d 1293, 1301 (1989)) (additional citations omitted)). Plaintiffs have not met this burden.

In the SAC, Plaintiffs maintain that the "very central essence" of the parties' agreement was that Defendants would "stop any foreclosure so as to provide [Plaintiffs] with breathing room and refinancing options." SAC ¶ 30, Dkt. No. 40. Plaintiffs allege that Defendants, "knowing that [Dairy Road] would be damaged as a result of their false promises" (SAC ¶ 34(b)), misrepresented that: (1) Defendants "intended to help" Plaintiffs, (2) Defendants "would purchase the ASB [L]oan indirectly for" Plaintiffs, (3) Defendants "would give [Plaintiffs] time to buy back the property," (4) Plaintiffs "would have three options for buying back the property and that they could choose any one of the three," (5) "upon the purchase of the ASB [L]oan," Defendants "would not foreclose" and would dismiss the Foreclosure Action, (6) "there would be no foreclosure deficiency judgment against" Plaintiffs, and (7) Plaintiffs "would benefit from the discounted price negotiated and paid to ASB" (SAC ¶ 34(a)). Plaintiffs contend that they were induced by these seven fraudulent misrepresentations "to divulge confidential proprietary information to [Defendants] under false pretenses and false promises

that Cheng was going to assist them, when in fact Cheng and [Maui Gas] never intended to assist [Dairy Road] to save the [S]ubject [P]roperty from foreclosure . . . ." SAC ¶ 34, Dkt. No. 40; *see also* Opp'n at 7, Dkt. No. 45.

According to Defendants, however, these allegations fail to plead a viable claim for either Misrepresentation or Fraud in Count I under the stringent pleading requirements set forth in Rule 9(b) of the FRCP. *See* Mem. in Supp. at 23, Dkt. No. 41-1. Defendants are correct.

A.  *Rule 9(b) Pleading Requirements for Fraud*

 "An allegation of fraud is sufficient" under Rule 9(b) "if it 'identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'" *Heartland*, 2012 WL 488107 at *4 (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)). To sufficiently "identif[y] the circumstances constituting fraud," a plaintiff must identify facts providing details of the alleged fraudulent activity such as times, dates, and places. *Neubronner*, 6 F.3d at 672 (citing *Gottreich v. San Francisco Inv. Corp.*, 552 F.2d 866, 867 (9th Cir. 1977); *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985)); *see also Moore*, 885 F.2d at 540 (noting that the rule requires detailed allegations of fraud setting forth "the time, place, and nature of the alleged fraudulent activities"). Moreover, beyond setting forth the objective facts necessary to identify the allegedly fraudulent statements or transactions, a plaintiff "must set

forth what is false or misleading about [a given] statement, and why it is false."
*Vess*, 317 F.3d at 672 (quoting *Decker v. GlenFed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994)).

Striking a balance "between the need to protect defendants from having to defend factually baseless litigation and the need to afford plaintiffs an adequate opportunity to develop factual bases for legitimate claims" via discovery, the Ninth Circuit has held that "Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge." *Neubronner*, 6 F.3d at 672 (citing *Wool v. Tandem Comps. Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987); *Moore*, 885 F.2d at 540; *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247–48 (2d Cir. 1987); *In re Worlds of Wonder Secs. Litig.*, 694 F. Supp. 1427, 1433 (N.D. Cal. 1988)). However, "this exception does not nullify Rule 9(b)," for even when "allegations of fraud [are] based on information and belief," the pleadings nonetheless "do not satisfy Rule 9(b) if the factual bases for the belief are not included." *Heartland*, 2012 WL 488107, *4 (citing *Neubronner*, 6 F.3d at 672).

Here, the seven "misrepresentations" listed in the pleadings do not meet these standards. Specifically, the SAC's fraud/misrepresentation allegations do not identify *when* each of the alleged misrepresentations was made, *who* made each of them, *to whom* each representation was made, or the circumstances surrounding the communication (i.e., the *where* and *how*) of the falsehood. *See Moore*, 885 F.2d at

540; *Nordic PCL*, 870 F. Supp. 2d at 1036–37 (requiring allegations to be "accompanied by 'the who, what, when, where, and how' of the misconduct charged" (quoting *Vess*, 317 F.3d at 1106)).

Plaintiffs appear to recognize their deficiencies and have attempted to cure them by adding a new paragraph to the third version of their complaint.[9]  That paragraph introduces and attaches hundreds of pages of emails as Exhibit 7 to the SAC that are presumably intended to identify the "date, parties, content, and timeline . . ." of the supposed fraud.   SAC ¶ 32, Dkt. No. 40.  Yet this strategy fails to identify for the Court—or Defendants—the *specific* location(s) within the voluminous Exhibit 7 of representations that allegedly constitute fraud.  *See* Mem. in Supp. at 20, 22, 24, Dkt. No. 41-1 (noting that Plaintiffs fail to specify what "false pretenses" were used other than "vague implied" promises and when those

---

[9]That paragraph reads, in full,

> 32.    All of the above assurances and representations and reliances are fully documented and embodied throughout the above-referenced nearly four months of emails variously exchanged cross-referencing the tied together the negotiations between Cheng (representing himself and his Texas companies), attorney Choi (representing [Dairy Road] and Nakamura), the Nakamuras (Glenn and his Son Garth), attorney Mau (representing ASB), attorney Gelber (representing a lessee), accountant Wong (representing Cheng and his companies) and/or attorney Barbieri (representing Cheng and his companies) during the months of September, October, November, and December 2014, some of which are set forth in Exhibit 7 attached hereto, incorporated herein as to date, parties, content, and timeline, as requested by [Maui Gas] and Cheng in their insincere objections to the content of the original Complaint herein.

SAC ¶ 32, Dkt. No. 40.

promises were made).  Plaintiffs provide no authority for the proposition that such

a blind reference to several hundred pages of documents—whether "incorporated

herein as to date, parties, content, and timeline" or otherwise—can satisfy Rule

9(b)'s heightened standard, and the Court knows of none.[10]  *See Moore*, 885 F.2d

at 540.

> B.    *Common Law Fraud/Misrepresentation*

Even assuming Plaintiffs' factual allegations are true, and are supported by

the voluminous record, Plaintiffs' allegations do not state a claim for fraud.  *See*

*Shoppe*, 14 P.3d at 1067 (citations omitted).

In most instances, fraud is actionable only if the first element—material

(mis)representation—"relate[s] to a past or existing material fact and not the

occurrence of a future event."  *TSA Int'l*, 990 P.2d at 725 (emphasis omitted)

(citing *Stahl v. Balsara*, 587 P.2d 1210, 1214 (1978)).

---

[10] *See, e.g.*, *Heartland*, 2012 WL 488107 at *3 (noting that "[s]ome courts have held that fraud claims fail to satisfy Rule 9(b)'s heightened pleading requirement when they rely on shotgun or puzzle pleadings." (footnotes omitted)) (citing *Wagner v. First Horizon Pharm., Corp.*, 464 F.3d 1273, 1280 (11th Cir. 2006); *In re Metro. Secs. Litig.*, 532 F. Supp. 2d 1260, 1279 (E.D. Wash 2007); *In re Autodesk, Inc. Secs. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000)).  *Cf. Kamaka v. Goodsill Anderson Quinn & Stifel*, 176 P.3d 91, 113 n.23 (2008) ("This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions." (quoting *In re Guardianship of Carlsmith*, 151 P.3d 692, 715–16 (Haw. 2007)); *Rundgren v. Bank of N.Y. Mellon*, 2010 WL 11470586, *2 (D. Haw. Oct. 29, 2010) ("[T]he court rejects that the court, on its own, must pore through [plaintiff's] documents [attached to the complaint] to sua sponte raise potential arguments for [p]laintiff—judges are not 'like pigs, hunting for truffles [in the record].'") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  *But see GlenFed*, 42 F.3d at 1548 n.7 (holding that the specific complaint at issue satisfied Rule 9(b) even though its organization made the nature of the fraud "difficult to divine").

> Fraud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such a promise.

*Stahl*, 587 P.2d at 1214; *Shoppe*, 14 P.3d at 1068; *see, e.g.*, *Prim Liab. Co. v. Pace-O-Matic, Inc.*, 2012 WL 263116, *9 (D. Haw. Jan. 30, 2012) ("[Party]'s contractual promises cannot form the basis of a fraud claim."); *Courter v. Karolle*, 2013 WL 2468360, *9 [FOF 16] (D. Haw. June 6, 2013) ("[Defendant's] claim for fraud must fail as a matter of law because the false statement forming the basis of the claim (i.e., that [plaintiff] promised to hold title to [the subject property] in name only, and to allow [defendant] to transfer title back to himself whenever he wished) are promissory in nature and, therefore, insufficient to support a claim for fraud.").

The first three alleged misrepresentations—that (1) Defendants intended to help the Plaintiffs;[11] (2) Defendants would purchase the ASB Loan indirectly on Plaintiffs' behalf;[12] and (3) Defendants would give Plaintiffs time to buy back the

---

[11] *See, e.g.*, SAC ¶¶ 11 ("Nakamura was induced to acquaint Cheng with the Subject Property of [Dairy Road], with promises that Cheng and [Maui Gas] could financially assist him . . . ."); 15 (referring to "Cheng's promise of financial assistance to Nakamura and [Dairy Road]"); 16 ("Cheng represented . . . that Cheng was going to buy the ASB Loan . . . to help [Dairy Road] . . . .").

[12] *See, e.g.*, SAC ¶¶ 15 (describing Cheng's September 20, 2014 offer to ASB, "which began Cheng's negotiations to acquire the Subject Property with the blessings of [Dairy Road] and

property[13]—even if true, are "promissory in nature and, therefore, insufficient to support a claim for fraud." *Courter*, 2013 WL 2468360 at \*9 [FOF 16] (concluding after a bench trial that "[the defendant]'s [counter]claim for fraud must fail as a matter of law because the false statement forming the basis of the claim (i.e., that [the plaintiff had] promised to hold title to [the subject property] in name only, and to allow [the defendant] to transfer title back to himself whenever he wished) are promissory in nature and, therefore, insufficient to support a claim for fraud."); *Honolulu Fed. Sav. & Loan Ass'n v. Murphy*, 753 P.2d 807, 204 (Haw. Ct. App. 1988) [hereinafter *HonFed*] ("[B]ecause the bank's alleged representations as to how it intended to go about collecting the note in the event of default were promises as to future acts, they were insufficient as a matter of law to constitute fraud in the procurement of the guaranty." (quoting *Rogers v. C & S Nat'l Bank*, 274 S.E.2d 722, 723 (Ga. Ct. App. 1980)) (internal brackets omitted)).

---

indirectly on its behalf"); 16 ("[S]tarting approximately September 17, 2014 and terminating on December 26, 2014, . . . Cheng represented to Nakamura and to Choi and to Garth . . . that Cheng was going to buy the ASB Loan on their behalf . . . ."). *Cf., e.g.*, SAC ¶ 18 ("Cheng explained to Nakamura that he and Alice Wong and others on his Texas staff . . . needed confidential proprietary information about the Subject Property from [Dairy Road] available only from [Dairy Road], or Cheng could not do the deal on behalf indirectly of Nakamura . . . .").

[13]*See, e.g.*, SAC ¶¶ 16 ("Cheng represented to Nakamura and to Choi and to Garth . . . that Cheng was going to buy the ASB Loan . . . to help [Dairy Road] gain some time to refinance or sell . . . ."); 17 ("Cheng represented that they . . . would be . . . giving [Dairy Road] additional time to work out a refinance or sale, Cheng being compensated by being paid a premium by [Dairy Road]."); 21 ("The agreement between the parties to stop any foreclosure sale and to provide additional time for [Dairy Road] to refinance or sell the Subject Property was further memorialized in a series of written drafts prepared by Cheng's side . . . .").

And the remaining alleged misrepresentations—that (4) Plaintiffs would have three buy-back options to choose from;[14] (5) Defendants would not foreclose on Plaintiffs upon the purchase of the ASB Loan;[15] (6) there would be no foreclosure deficiency judgment against Plaintiffs;[16] and (7) Plaintiffs would benefit from the discounted price negotiated and paid to ASB[17]—are clearly predictions of future events, rather than misstatements of existing fact. *See HonFed*, 753 P.2d at 813; *Stahl*, 587 P.2d at 1213–14 (holding that each of the defendant-astrologer's alleged misrepresentations were prophesy relating to future events, not material facts that were actually false at the time the representations were made (citing *Peine v. Murphy*, 377 P.2d 708, 712 (Haw. 1962)). So *without more*, Plaintiffs may not

---

[14] *See, e.g.*, SAC ¶¶ 23 (alleging that "it was not a question of whether the parties could reach agreement, but merely which alternative Nakamura and [Dairy Road] would accept, one of many and at their election or so they and Choi were told by Cheng, Wong, and Barbieri"); 25 (stating that "the parties had," by October 29, 2014, "negotiated, accepted and agreed upon virtually every material contract term of their arrangement with only Nakamura needing to elect among proposed alternative refinancing terms," and that Cheng was still offering [Dairy Road] three options in writing as late as December 10, 2014, telling Nakamura that all he would have to do was pick one.").

[15] *See, e.g.*, SAC ¶ 17 (alleging that "Cheng specifically t[old] Nakamura that upon acquiring the ASB [L]oan Cheng would not foreclose but instead give Nakamura time to refinance"). *Cf., e.g.*, SAC ¶ 21 (referring to Cheng's "promises to give [Dairy Road] the option of paying off its first mortgage once acquired by Cheng through one of his companies for a premium").

[16] *See, e.g.*, SAC ¶¶ 14 ("Cheng approached Nakamura, proposing to buy [the] ASB Loan and stopping the Foreclosure Action . . . ."); 21 (describing Cheng's "promises to assist [Dairy Road] in stopping the Foreclosure Action").

[17] *See, e.g.*, SAC, Ex. 7.4 at 34–39, Dkt. No. 40-11 (informing Garth that "[t]he benefits of a purchase of the Note" by Cheng to Dairy Road, would be: "Mitigation of foreclosure risks[,] Reasonable payment stream due to lower initial cost, Limited Liability in case the business fails[,] Flexible Terms[, and] Buyback Options").

base Count I on such statements. *Heartland*, 2012 WL 488107 at *6 (the alleged

statement that plaintiff "would benefit as a result of [a] 'large and valuable

merchant base in Hawaii' . . . does not allege a factual misrepresentation, instead

offering a prediction," and noting further that "[i]f [plaintiff] takes issue with

[defendant]'s representation that it had a 'large and valuable merchant base,' it

fails to allege . . . or explain . . . what makes this statement false.").

"Promissory" representations like those listed in the SAC *may* be actionable

as fraud "if [the representation was] made without the present intent to perform."

*HonFed*, 753 P.2d at 813 ("Absent [any fraudulent] intent [not to perform its

alleged promise], we must hold that '[b]ecause the bank's alleged representations

as to how it intended to go about collecting the note in the event of default were

promises as to future acts, they were insufficient as a matter of law to constitute

fraud in the procurement of the guaranty.'" (quoting *Rogers v. C & S*, 274 S.E.2d

at 723)); *Eastern Star, Inc., S.A. v. Union Bldg. Materials Corp.*, 712 P.2d 1148,

1159 (Haw. Ct. App. 1985) ("It is true that 'fraud cannot be predicated on

statements which are promissory in their nature,' but a promise made without the

present intent to fulfill the promise is actionable as fraud." (internal citations

omitted)).  To recover for a future promise, however, there must be some

affirmative evidence of fraudulent intent.  *HonFed*, 753 P.2d at 203 (citing *Aloha

Petroglyph, Inc. v. Thomas*, 619 P.2d 518, 519 (Haw. Ct. App. 1980)).   Here, there

is none.  Plaintiffs have not alleged facts establishing that "[Defendants] never intended to honor [their] promises."  SAC ¶ 34(a), Dkt. No. 40.

Several examples illustrate this omission.  First, Plaintiffs place great stock on an October 29, 2014 email from Cheng to Choi that reads in relevant part, "We are ON."  Dkt. No. 40-11 at 15.  This email came immediately on the heels of Cheng's purchase of Defendants' loan from ASB.  Plaintiffs state that these three words somehow indicate that Cheng purchased the loan "*on behalf of [Dairy Road] and Nakamura*" (SAC ¶ 24, Dkt. No. 40 (emphasis added)), and "had . . . negotiated, accepted, and agreed upon virtually every material contract term" of a loan modification agreement with Nakamura.  SAC ¶ 25, Dkt. No. 40.  Just how these three words accomplish all of that, and how they evidence fraudulent intent, Plaintiffs do not explain.  Read in context, all these words appear to mean is that Cheng had wrapped up the ASB Loan purchase and would be turning his attention to attempting to reach a second deal—this time, with Defendants—to modify their loan.  There is nothing misleading or fraudulent about that because that is precisely what Plaintiffs' voluminous record demonstrates Cheng did.

Second, Plaintiffs place equal stock on Barbieri's two-word question— "What option?"—in a December 29, 2014 email exchange with Choi.  SAC, Ex. 7.2 at 53, Dkt. No. 40-9.  Plaintiffs appear to believe that this question implied that Defendants were denying having provided several buyback options to Nakamura in

an email from Cheng on December 10, 2014. *See* Opp'n at 4, Dkt. No. 45.

Plaintiffs read much from nothing. Barbieri's email was a response to Choi's

request for a copy of an unspecified "option." SAC, Ex. 7.2 at 53–54, Dkt. No. 40-

9. Why Choi (*not* Barbieri) even used the term "option" is not clear, since he later

clarified that the document he wanted was the Cheng-ASB agreement to purchase

Defendants' loan. *Id.* In other words, the December 29 email exchange had

nothing to do with Cheng's December 10 buyback proposal. And even if it had,

how it evidences fraudulent intent on the part of Defendants is a mystery.

Third, Plaintiffs assert that despite Cheng's representations to the contrary,

he never intended to work out a new loan with Plaintiffs, and this is demonstrated

by Defendants injecting new environmental remediation prerequisites into the deal

at the eleventh hour. *See* SAC ¶ 25, Dkt. No. 40. This allegation is completely

contradicted by the record and is entitled to no deference. *Sprewell*, 266 F.3d at

988; *see also Iqbal*, 556 U.S. at 678; *Starr*, 652, F.3d at 1216. What Plaintiffs own

record demonstrates is that Cheng was concerned about the property's

environmental condition *from the very beginning*. As early as September 9, 2014,

more than a month before he had even reached a deal with ASB, Cheng advised

Nakamura that to work out a loan modification, he needed to see the "ESA report

on contamination." SAC, Ex. 7.3 at 33, Dkt. No. 40-10. The significance of

environmental problems was also known early on to Defendants' attorney, Chuck

Choi, as Choi addressed it only a week later in a draft September 17 email to ASB that he prepared for Cheng. SAC, Ex. 7.3 at 35–36 ("I also understand that Dairy Road Partners' underground storage tanks have discharge issues that could cost Dairy Road or any other potentially responsible party significant sums to remediate."). And as if that was not enough to dispel Plaintiffs' conjecture, Cheng made clear as early as October 15, 2014 that "health dept sign off" on remediation of the property would be necessary "before I close." SAC, Ex. 7.1 at 23, Dkt. No. 40-8.

Plaintiffs, in other words, have offered nothing by way of fraudulent intent, other than conclusory statements that "[Defendants] never intended to honor [their alleged] promises" (SAC ¶ 34(a)), that are not supported—and in some cases, contradicted—by the very record Plaintiffs have introduced as part of their complaint. *Stahl*, 587 P.2d at 1213–14 ("[T]he record is absolutely bare as to any evidence to show whether the [defendant] had any knowledge of or knew at the time when the [subject] representations were communicated by [defendant] that they were false[.]").

Accordingly, Plaintiffs' claim for fraud/misrepresentation (Count I) is DISMISSED.

II.     **Breach of Contract** (Count II)

At the core of the instant dispute is Plaintiffs' contention that the parties reached a loan modification agreement—the "very central essence" of which "was to stop any foreclosure so as to provide [Plaintiffs] with breathing room and refinancing options." SAC ¶ 30, Dkt. No. 40. In Count II, Plaintiffs allege that they have suffered damage as a result of Defendants' breach of this contract.

To prevail on a claim for breach of contract in Hawai'i, a party must prove: "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by Defendants; and (5) when and how Defendants allegedly breached the contract." *Keahole Point Fish LLC v. Skretting Canada Inc.*, 971 F. Supp. 2d 1017, 1040 (D. Haw. 2013) (quoting *Evergreen Eng'g, Inc. v. Green Energy Team LLC*, 884 F. Supp. 2d 1049, 1059–60 (D. Haw. 2012)). As proof of the purported agreement they seek to enforce, Plaintiffs offer three things: (1) an unsigned, draft Term Sheet and Letter of Intent (SAC, Ex. 3 [Term Sheet], Dkt. No. 40-4), (2) an unsigned and undated, draft "First Loan Modification Agreement" (SAC, Ex. 4 [First Modification Agreement], Dkt. No. 40-5); and (3) the parties' alleged part performance of these agreements in the form of Plaintiffs providing confidential proprietary information to Defendants upon purchase of the ASB Loan (*see* SAC ¶¶ 18–20, Dkt. No. 40). Defendants, in contrast, characterize their purchase of the

ASB Loan as an "independent transaction between ASB and Mr. Cheng" that "was *not* dependent on the proposed loan modification." Reply at 6–7, Dkt. No. 46 (citing MTD at 9, Dkt. No. 41-1). They assert that no independent loan modification agreement with Plaintiffs was ever consummated. *Id.*

None of the evidence Plaintiffs provide establishes the existence of "the contract at issue" or any "particular provision of the contract allegedly violated" that may be enforced by the Court. *Keahole*, 971 F. Supp. 2d at 1040. Accordingly, the MTD is GRANTED as to Count II.

A.  *The Unsigned Documents Plaintiffs Cite Are Not Contractually Enforceable.*

As evidence of an alleged agreement between Cheng and Nakamura "to stop any foreclosure sale and to provide additional time for [Dairy Road] to refinance or sell the Subject Property" (SAC ¶ 23, Dkt. No. 40), the pleadings describe "a series of written drafts prepared by Cheng's side"—including an unsigned, but "very detailed 'Term Sheet and Letter of Intent'" (Dkt. No. 40-4) and an unsigned and undated "First Loan Modification Agreement" (Dkt. No. 40-5).

Under the Hawaiʻi Statute of Frauds, HRS § 656-1(4), no action may be brought based "[u]pon any contract for the sale of lands . . . or of any interest in or concerning them . . . unless the promise, contract, or agreement . . . is in writing, and is signed by the party to be charged therewith . . . ." It is undisputed that this writing requirement is applicable because, as Defendants note, "[t]here is no

question that the agreement that Plaintiffs claim Defendants breached concerns a contemplated modification of the ASB [L]oan, which was secured by a mortgage on the Subject Property." Mem. in Supp. at 25, Dkt. No. 41-1 (citing *Au v. Republic State Mortg. Co.*, 2013 WL 1339738, *6 (D. Haw. Mar. 29, 2013) (loan modification agreements subject to the statute of frauds)). At best, the documents on which Plaintiffs rely "speak[] only of the possibility of an agreement without [the parties actually] agreeing to anything." *Eckerle v. Deutsche Bank Nat'l Trust*, 2011 WL 4971128, *4 (D. Haw. Oct. 18, 2011), *aff'd*, 580 Fed. Appx. 527 (9th Cir. 2014).

The fact that the parties may have "jointly worked for months . . . constantly exchanging emails, to come up with a plan to allow Defendants to approach ASB and to purchase the Plaintiffs' mortgage loan at a discount" (Opp'n at 2–3, Dkt. No. 45 (citing SAC ¶ 17, Dkt. No. 40)) is irrelevant. Plaintiffs' voluminous submissions do not contain any actual agreement, nor do they allege one. *See Northern Trust, NA v. Wolfe*, 2012 WL 1983339, *21–22 (D. Haw. May 31, 2012) (finding oral agreement not to reinstitute foreclosure proceedings barred by statute of frauds and dismissing breach of contract claim)

    B.    *Nothing Else in the SAC Establishes the Existence of an Enforceable Agreement.*

The Court acknowledges that in some circumstances, a written and signed contract is not necessary to state a breach of contract claim. For instance, an

implied contract exists "where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts." *Kemp v. Haw. Child Support Enforcement Agency*, 141 P.3d 1014, 1038 (Haw. 2006). The Hawaiʻi Supreme Court has found such an obligation "in the case where a person performs services for another, who accepts the same, the services not being performed under such circumstances as to show that they were intended to be gratuitous, or where a person performs services for another on request." *Id.* (quoting *Durette v. Aloha Plastic Recycling*, 100 P.3d 60, 74 (Haw. 2004) (internal citations and quotation marks omitted)).

The essential element of an implied contract, as with all contracts, "is an apparent mutual intent to form a contract." *Rogers v. Fukase*, 2010 WL 4812772, *6 (D. Haw. Nov. 16, 2010) (quoting *Kemp*, 141 P.3d at 1038). "[T]he intent to incur mutual obligations is implied from the actions of the parties." *Id.* Indeed, "[i]t is a fundamental principle of law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *Carson v. Saito*, 489 P.2d 636, 638 (Haw. 1971) (quoting *Honolulu Rapid Transit Co. v. Paschoal*, 51 Haw. 19, 26, 449 P.2d 123, 127 (Haw. 1968)); *accord Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) (citation omitted). Such mutual assent, at minimum, must include "an offer, an acceptance, and consideration." *In re Estate of Tahilan v. Friendly Care Home*

*Health Servs., Inc.*, 731 F. Supp. 2d 1000, 1006 (D. Haw. 2010) (quoting *Douglass*

*v. Pflueger Haw., Inc.*, 135 P.3d 129, 134 (Haw. 2006)); *cf.* Restatement (Second)

of Contracts § 71 (1981) (consideration is supplied by bargained for performance).

No such mutual assent is evident for at least two reasons.  First, as described

in part above, Defendants consistently conditioned any deal with Plaintiffs on

consideration in the form of environmental remediation of the Subject Property,

and it is undisputed that not only did no such remediation occur, but nothing akin

to part performance by Plaintiffs was even attempted.  *See* Reply at 7–8, Dkt. No.

46 (noting that Defendants "repeatedly demanded environmental remediation and

confirmation of 'no further action' needed," but "these conditions were never

met") (citing SAC, Ex. 7.2 at 11, Dkt. Nos. 40-9 (email listing production of health

department permit to continue operation as a required term of the proposed deal);

SAC, Ex. 7.1 at 57, Dkt. No. 40-8 (including final environmental cleanup cost and

"tank pressure test" in due diligence cost estimates)).

Second, the SAC describes a chronology that cannot be mistaken for an

implied agreement.  In late December 2014, near the very end of the emails offered

by Plaintiffs as part of the SAC, Cheng told Choi unequivocally that "We are not

closing the deal unless [Barbieri is] satisfied with the details" (SAC, Ex. 7.4 at 57,

Dkt. No. 40-11), and Barbieri informed Choi that there were details that remained,

"all of which [the parties would] need to get worked out before the loan

modification agreement goes into effect," specifically including environmental remediation issues (SAC, Ex. 7.2 at 2, Dkt. No. 40-9). Aside from remediation, among the remaining loose ends were several estoppel agreements to be executed by the borrower, guarantor, and Subject-Property tenants. *See* SAC, Ex. 7.2 at 9, Dkt No. 40-9. The SAC shows that as of December 30, 2014, Barbieri had still "never heard back from" at least one of the Subject Property's tenants regarding the estoppel agreements. SAC, Ex. 7.3 at 30, Dkt. No. 40-10; *see also* SAC, Ex. 7.3 at 6, Dkt. No. 40-10 (reminding Choi that before Barbieri could finalize any agreement, Barbieri would "need to get [Cheng]'s approval . . . first").

Unable to find or infer the existence of a binding contract, the Court GRANTS Defendants' Motion to Dismiss Count II of the SAC.

III. **Promissory Estoppel** (Count III)

"Under Hawaii law, the four elements of promissory estoppel are:

> (1) There must be a promise; (2) The promisor must, at the time he or she made the promise, foresee that the promisee would rely upon the promise (foreseeability); (3) The promisee does in fact rely upon the promisor's promise; and (4) Enforcement of the promise is necessary to avoid injustice. The "essence" of promissory estoppel is "detrimental reliance on a promise."

*Hi-Tech Rockfall Const., Inc. v. Cty. of Maui*, 2009 WL 529096, *9–10 (D. Haw. Feb. 26, 2009) (quoting *Gonsalves v. Nissan Motor Corp. in Haw., Ltd.*, 58 P.3d 1196, 1211–12 (Haw. 2002)). A promise is "a manifestation of intention to act or

refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Gonsalves*, 58 P.3d at 1212.

Here, the SAC alleges:

> Plaintiffs were promised by Defendants [1] assistance in stopping the foreclosure; promised [2] three options to choose from, [3] promised the ability to cancel the mortgage loan for a later premium, [4] promised that the foreclosure would be halted, [5] promised that they would share in the advantage of the discounted purchase price.

Opp'n at 14, Dkt. No. 45.

Plaintiffs claimed to have detrimentally relied on these promises by: (1) "ignoring other refinancing alternatives," (2) "not objecting to ASB's sale to Cheng and [Maui Gas]," (3) "giving ASB a waiver of liability," and (4) "instruct[ing]" that "confidential proprietary information about the Subject Property from [Dairy Road] available only from [Dairy Road], . . . be freely given to Cheng[.]" SAC ¶¶ 17, 18, Dkt. No. 40.

As for ignoring other refinancing alternatives, Plaintiffs specify that "[Dairy Road] and Nakamura could have paid the $400,000 discounted buyout price themselves to ASB then and there in 2014 through others, or sold the property, or could have exercised beforehand any of Cheng's three options aforesaid at that time, and would have had they been alerted to Cheng's true plans." SAC ¶ 26,

Dkt. No. 40.[18] However, as Defendants have pointed out, "Plaintiffs fail to explain how [this] is plausible in light of their undisputed and long-standing default and ongoing foreclosure litigation at the time." Reply at 9. Moreover, Plaintiffs do not allege that Defendants demanded "exclusive" negotiations with Plaintiffs, so "nothing precluded Plaintiffs from seeking other options." Reply at 9, Dkt. No. 46.

As for the contention that they would have objected to ASB's sale of the defaulted loan to Cheng if they had known of Cheng's "true plans," the Court is unable to discern support for this argument anywhere in the pleadings. *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 614 n.23 (9th Cir. 2010) (explaining that when a party fails to support an argument beyond a bare assertion, courts deem the argument to be waived); *Entm't Res. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997); *see also* Local R. 7.6 (requiring factual support for each assertion of fact in any motion or appeal). There is, for instance, no indication that Plaintiffs has standing to object, nor is there any indication that ASB would have listened. Indeed, when Choi attempted to put himself between Cheng and ASB during the early ASB Loan

---

[18] *See also, e.g.*, SAC ¶¶ 11 (stating that "promises that Cheng and [Maui Gas] could financially assist him . . . induced Nakamura based on reasonable reliance upon the promises of Cheng to ignore other financial alternatives, such as a sale or refinancing"); 14 ("Had Cheng not offered to help, Nakamura would have sought to secure a discounted ASB payoff and refinanced elsewhere through family and friends"); 16 ("Cheng represented to Nakamura and to Choi and to Garth Nakamura that Cheng was going to buy the ASB Loan on their behalf to help [Dairy Road] gain some time to refinance or sell, upon which witnessed promise [Plaintiffs] relied, ignoring other refinancing alternatives.").

purchase negotiations, ASB advised that it would not deal with Choi and would only deal directly with Cheng. SAC, Ex. 7.1 at 24, Dkt. No. 40-8.

Regarding the suggestion that Plaintiffs "relied to their detriment" on Cheng's alleged promises by "giving ASB a waiver of liability" (SAC ¶ 17) for "wrongful foreclosure" (SAC ¶ 22), Plaintiffs ignore that reliance is not necessarily detrimental. Here, Cheng purchased the loan, and in doing so, stepped into the shoes of ASB. Whatever defenses to foreclosure Plaintiffs had could presumably have likewise been asserted against Cheng in the Foreclosure Action. Plaintiffs in that sense lost nothing by virtue of the change in the holder of their note.

Last, regarding the sharing of confidential proprietary information, Plaintiffs contend that between October 29 and November 17, 2014, Cheng and his agents requested information from Plaintiffs regarding Dairy Road's sub-agreements with the lessees operating on the Subject Property, including copies of leases, insurance policies, various environmental reports, and budgets, among other things. *See e.g.* SAC, Ex. 7.1 at 57, 61, Dkt. No. 40-8; SAC, Ex. 7.4 at 25, Dkt. No. 40-11. Plaintiffs suggest that these requests establish that Defendants *required* this information in order to complete their purchase of the ASB Loan. *See* SAC ¶ 20, Dkt. No. 40 ("Without [Dairy Road's] assistance, such information would have been difficult, if not absolutely impossible to readily acquire as a part of any necessary due diligence prior to the purchase of the ASB Loan by anyone."). Even

assuming the truth of these allegations, however, the timing of these information requests precludes Plaintiffs' conclusion that the information was provided to their detriment.  That is, ASB had already accepted Cheng's offer on October 29 *before* Defendants' first information request on November 7.  *See* SAC, Ex. 7.1 at 31, 57, 61, Dkt. No. 40-8; SAC, Ex. 7.4 at 25, Dkt. No. 40-11.  In fact, Defendants sent their "Proposal to Glenn Nakamura—Dairy Road Ventures Maui Gas Station" the day after Defendants' final request for information on November 17, 2014.  SAC, Ex. 7.1 at 61, Dkt. No. 40-8; SAC, Ex. 7.4 at 83, Dkt. No. 40-11.  The plausible inference then is that Defendants sought the information Plaintiffs characterize as proprietary in order to structure a potential buyback deal between themselves and Plaintiffs, and *not* in order to purchase the ASB Loan.  *See, e.g.*, *Dement v. Atkins & Ash*, 631 P.2d 606, 609 (Haw. Ct. App. 1981) ("[T]he facts clearly indicate that [plaintiff] is complaining about what did and did not happen after she signed the [document].  They show that she became aware of [defendant]'s alleged commitment that she would not have to pay fees of any kind, not to [defendant] or to the architect(s) or to the engineer, after she signed the [document] and therefore it cannot be said to have induced her to sign [it].  Consequently, it is impossible for [plaintiff] to establish all of the elements necessary to prove fraudulent inducement.").

Lacking the requisite detrimental reliance, Plaintiffs' claim for Promissory

Estoppel fails as a matter of law. Count III is DISMISSED.

IV.    **Specific Performance** (Count IV)

According to Plaintiffs, "having established their right to relief," they "can elect damages or specific performance of their agreements with the Defendants." Opp'n at 15, Dkt. No. 45.

Contrary to Plaintiffs' assertions (Opp'n at 15), however, specific performance is a remedy—not an independent claim. Moreover, "[s]pecific performance is by definition limited to the enforcement of contract duties." *Clarkin v. Reimann*, 638 P.2d 857, 864 (Haw. Ct. App. 1981) (quoting Introductory Note, Topic 3, Ch. 16, Restatement of Law (Second), Contracts 2d (1979)). In light of the Court's holding, *supra*, that there is no enforceable contract, specific performance cannot lie.

V.    **Breach of Fiduciary Duty** (Count V)

In Count V of the SAC, Plaintiffs allege that

> [Dairy Road] and Nakamura entered into a fiduciary relationship with Cheng by being induced to and freely sharing confidential proprietary information with him . . . , their being financially vulnerable and taken advantage of by Cheng who claimed to have and who had superior knowledge regarding how to deal with ASB as a lender . . . , in effect having entered into a joint venture with one another in order to carry out a specific plan to stop the . . . foreclosure action by purchasing the [S]ubject [P]roperty at a discount from ASB in the name of [Maui Gas] as a fiduciary on behalf of [Dairy Road] to the profit of both, which induced Nakamura and [Dairy Road] to agree, giving up other refinancing alternatives.

44

SAC ¶ 41, Dkt. No. 40. Plaintiffs further allege that "Cheng and [Maui Gas] have breached that confidential relationship . . . by rushing to foreclosure and denying [Plaintiffs] their bargained for buyout options . . . while profiting with unjust enrichment that should be disgorged." SAC ¶ 42, Dkt. No. 40. As a result, Plaintiffs seek "a decree of this Court" as to these facts and argue that Defendants' actions "entitl[e] [Dairy Road] and Nakamura to . . . specific performance of their agreement with Cheng, and an award of actual damages plus attorney's fees and court costs." SAC ¶ 42, Dkt. No. 40. Defendants, on the other hand, contend that "Plaintiffs have failed to allege any *facts* supporting the notion that they and Defendants were in a relationship of trust or confidence." Mem. in Supp. at 31, Dkt. No. 41-1. Defendants are correct.

In Hawaiʻi, a "fiduciary relation exists between parties where there is a relation of trust and confidence between them, that is, where confidence is reposed by one party and the trust accepted by the other." *Courter*, 2013 WL 2468360 at *9 (quoting *Kaiser v. First Hawaiian Bank*, 30 F. Supp. 2d 1255, 1265 (D. Haw. 1997)); *see also Pulawa v. GTE Hawaiian Tel.*, 143 P.3d 1205, 1214 (Haw. 2006) (explaining that under Hawaii law, a duty may only be imposed where there is a "special relationship" between the parties); *Blair v. Ing*, 21 P.3d 452, 465 (Haw. 2001). "Friendship or admiration for another," however, "generally does not create the type of relationship of trust required to give rise to a fiduciary duty."

45

*Courter*, 2013 WL 2468360 at *9 (citing *Hawkins v. First Horizon Home Loans*, 2010 WL 4823808, *11 (E.D. Cal. Nov. 22, 2010)) ("Even if [the defendant]'s version of the events is true, a close friendship is simply insufficient to support a claim for fraud." (citing *Shoppe*, 14 P.3d at 1067)). Moreover "a conventional business relationship between parties dealing at arm's length does not give rise to fiduciary duties." *Lahaina Fashions, Inc. v. Bank of Haw.*, 319 P.3d 356, 375 (Haw. 2014) (quoting *Roni LLC v. Arfa*, 74 A.D.3d 442, 444 (N.Y. App. 2010)); *Hawkins*, 2010 WL 4823808 at *11 ("Absent special circumstances[,] a loan transaction is an at arms-length transaction and there is no fiduciary relationship between the borrower and a lender." (quoting *Oaks Mgmt. Corp. v. Superior Ct.*, 51 Cal. Rptr. 3d 561 (Cal. Ct. App. 2006)) (brackets and ellipses omitted).

Notwithstanding these principles, Plaintiffs contend that "[i]n Hawaii," the relationship of trust and confidence between parties is fiduciary in nature when it "aris[es] out of circumstances in which confidential information is divulged and/or where there is a superior relationship between them based upon the specialized knowledge and/or experience and/or professional standing of one of the parties." Opp'n at 16–17, Dkt. No. 45 (citing *Kaiser*, 30 F. Supp. 2d 1255; *Otaka, Inc. v. Klein*, 791 P.2d 713 (Haw. 1990)). Plaintiffs' conclusions aside, they offer no Hawaii case or other law that imposes a duty in the type of prospective lender-borrower relationship present here. Indeed, the cases on which Plaintiffs rely do

46

not stand for the broad proposition offered.  For example, in *Kaiser,* the district court neither addressed the divulgence of confidential information nor considered the duties owed between parties when only one has professional expertise.[19]  30 F. Supp. 3d at 1266.  The court's analysis of the fiduciary duty issue turned on the terms of a Custodial Account between a bank and a life insurance company, which defined the nature of the duties to be imposed.  *Id*. ("The court will not impose a fiduciary duty that adds additional, potentially contradictory duties to an express agreement of sophisticated parties negotiated at arm's length.").  And in *Otaka*, the nature of the duty imposed was driven by the special attorney-client relationship in that case that is nowhere present here.  791 P.2d at 717.

Accordingly, because the Court declines to impose a duty that the Hawaii courts have yet to even hint at recognizing, Plaintiffs' claim for Breach of Fiduciary Duty fails as a matter of law, and Count V is DISMISSED.

## VI.  **Limited Leave To Amend is Appropriate As To Count I**.

The Court grants leave to amend in this case with respect to Count I only. Counts II–V are dismissed with prejudice.

Under FRCP 15(a)(2), once a responsive pleading has been filed, a party "may amend its pleading only with the opposing party's written consent or the

---

[19]Moreover, it is not clear that Plaintiffs' premise of a "superior relationship" is even true, given that both sides were represented by counsel (Choi for Plaintiffs, Barbieri for Defendants) throughout the period in question.

court's leave," which should be given "freely . . . when justice so requires." *See Joy v. Hawaiʻi*, 2008 WL 4483798, *2 (D. Haw. Sept. 26, 2008) ("[T]he underlying purpose of Rule 15(a) . . . was to facilitate decisions on the merits, rather than on technicalities or pleadings." (quoting *In re Morris*, 363 F.3d 891, 894 (9th Cir. 2004)). "Courts may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment, etc.'" *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman*, 371 U.S. at 182) (some brackets omitted); *Finazzo v. Hawaiian Airlines*, 2007 WL 1080095, *5 (D. Haw. Apr. 6, 2007) (citing *Foman*, *supra*). "Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion." *Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973).

Here, although Plaintiffs have not requested leave to amend,[20] and this would not be the first amendment to their original complaint,[21] there is no evidence

---

[20]The Court raised the issue of dismissal without prejudice *sua sponte* at the November 16, 2017 hearing *and* gave both sides an opportunity to comment. Nonetheless, Plaintiffs' counsel failed to make a case for dismissal without prejudice, choosing instead to rebut unrelated factual points asserted by the defense.

before the Court suggesting that Plaintiffs' filing and subsequent withdrawal-by-stipulation (Dkt. No. 39) of the May 22, 2017 FAC was done "as a dilatory maneuver in bad faith." *Howey*, 481 F.2d at 1191. Moreover, "permitting an amendment" will not "produce an undue delay in litigation," nor have Defendants shown or even argued that they will be prejudiced. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387–88 (9th Cir. 1990); *cf. Hurn v. Ret. Fund Tr. of Plumbing*, 648 F.2d 1252, 1254 (9th Cir. 1981) ("The delay [a]ffected by permitting an amendment to the complaint cannot alone justify the denial of leave to amend.")). Accordingly, the Court's decision on amendment turns on futility. *See Cook, Perkiss & Liehe*, 911 F.2d at 247 ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." (citing *Bonanno*, 309 F.2d at 322; *Erlich*, 352 F.2d at 122)). *See generally Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend."). Amendment is futile where the proposed claims are duplicative of existing claims, patently frivolous, and/or legally insufficient. *See Miller v. Rykoff-Sexton*, 845 F.2d 209, 214 (9th Cir. 1988)

---

[21]Although the SAC filed July 20, 2017 (Dkt. No. 40) represents Plaintiffs' *actual* second amendment to their original complaint filed November 16, 2016 (Dkt. No. 1), however, Plaintiffs' purported "First Amended Complaint," filed without seeking leave of court on May 22, 2017 (Dkt. No. 28), was eventually withdrawn by stipulation on July 6, 2017 (Dkt. No. 39) and was not adjudicated. Thus, the SAC filed July 20, 2017 (Dkt. No. 40) is *technically* Plaintiffs' second version of their pleadings.

("[A] proposed amendment is futile only if no set of facts can be proved . . . that would constitute a valid and sufficient claim."), *abrogated by Iqbal*, 556 U.S. at 678 (proper pleading standard is now plausibility).

In the instant case, the Court has determined that Counts II (Breach of Contract), III (Promissory Estoppel), IV (Specific Performance), and V (Breach of Fiduciary Duty), each fail as a matter of law. Accordingly, amendment of these claims would be futile. Leave to amend Counts II through V is DENIED. *See Bonin*, 59 F.3d at 845.

In contrast, amendment of Count I may not be futile. As discussed above, the Court dismissed Plaintiffs' Count I fraud claim because the pleadings do not satisfy FRCP 9(b)'s requirement for pleading fraud with particularity and do not set forth a factual basis for the assertion that various statements were made without the intent to fulfill them. Unlike Counts II–V, "the underlying facts or circumstances relied upon" by Plaintiffs in Count I "may be a proper subject of relief" for fraud/misrepresentation, and Plaintiffs "ought to be afforded an opportunity to [test their] claim on the merits." *Foman*, 371 U.S. at 182. Because the Court cannot say that there is *no* set of facts that might give rise to a valid claim for fraud/misrepresentation, Count I is DISMISSED WITHOUT PREJUDICE, and Plaintiffs are granted limited leave to amend the SAC as to Count I only to attempt to cure the deficiencies identified in this Order. *Cf.,*

*Neubronner* 6 F.3d at 671 (9th Cir. 1993) (affirming dismissal with prejudice of *fifth* amended complaint where plaintiffs consistently failed to plead with the requisite particularity (citing *Semegen*, 780 F.2d at 731)).

Any amended complaint must designate itself as the "Third Amended Complaint" and may not incorporate any part of the original Complaint (Dkt. No. 1), the FAC (Dkt. No. 28), or the SAC (Dkt. No. 40); rather, any specific allegations must be re-written in their entirety. *See King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987), *overruled in unrelated part by Lacey v. Maricopa Cty.*, 693 F.3d 896, 927–28 (9th Cir. 2012) (en banc). Claims dismissed without prejudice that are not re-alleged in an amended complaint may be deemed voluntarily dismissed. *See Lacey*, 693 F.3d at 928. Failure to file an amended complaint consistent with the guidance provided by this Order will result in the dismissal of this action with prejudice.

//

//

//

//

//

//

//

## CONCLUSION

The Court hereby GRANTS Defendants' Motion to Dismiss.  Dkt. No. 41.

Count I of Plaintiffs' Refiled First Amended Complaint is DISMISSED

WITHOUT PREJUDICE, and Counts II–V are DISMISSED WITH PREJUDICE.

Any amended complaint with respect to Count I must be filed within thirty days of

this disposition.

IT IS SO ORDERED.

DATED: March 9, 2018 at Honolulu, Hawaiʻi



Derrick K. Watson
United States District Judge

*Dairy Road Partners v. Maui Gas Ventures LLC,* CIV. NO. 16-00611 DKW-KJM,
**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS REFILED
FIRST AMENDED COMPLAINT**

52