UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| DAIRY ROAD PARTNERS and GLENN NAKAMURA, Plaintiffs, vs. MAUI GAS VENTURES LLC and PAUL CHENG, Defendants. | CIV. NO. 16-00611 DKW-KJM ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND |

Dairy Road and Nakamura initiated this action on November 16, 2016. *See* Compl., Dkt. No. 1. On July 20, 2017, they filed a Second Amended Complaint ("SAC"),[1] seeking monetary damages and equitable relief arising out of an alleged, fraudulently procured loan agreement with Maui Gas and Cheng. Dkt. No. 40. On March 9, 2018, this Court dismissed the SAC, allowing leave to amend only the Count I claim for Fraud/Misrepresentation. Dkt. No. 54. Plaintiffs filed their Third Amended Complaint ("TAC") on April 9, 2018. Dkt. No. 55.

For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss the TAC (Dkt. No. 56) without leave to amend.

---

[1]Plaintiffs styled the SAC as a "Refiled First Amended Complaint."

1

## BACKGROUND

On December 9, 2009, American Savings Bank, F.S.B. ("ASB") extended a $1,384,213 commercial loan to Dairy Road ("ASB Loan") that was guaranteed by Nakamura, Dairy Road's General Partner. TAC ¶ 8, Dkt. No. 55. The ASB Loan granted ASB a lien and security interest in the property located at 380 Dairy Road, Kahului, Maui, Hawaii, Tax Map Key (2) 3-8-65-27 ("Subject Property").[2] TAC ¶¶ 4, 8, Dkt. No. 55.

On March 3, 2013, after Dairy Road fell behind on its mortgage payments under the ASB Loan, ASB filed for foreclosure in the Second Circuit Court of the State of Hawaii, Civil No. 13-1-0283(3) ("Foreclosure Action"). TAC ¶ 12, Dkt. No. 55. Dairy Road also filed for Chapter 11 bankruptcy around that time. TAC ¶ 13 (stating that the eventual dismissal of the bankruptcy case delayed proceedings in the Foreclosure Action until December 24, 2014).

### Facts According To The TAC

While the Foreclosure Action was pending, Cheng—"an investor from Texas" who is the "principal and controlling person" of Maui Gas (TAC ¶ 7, Dkt. No. 55)—allegedly approached Nakamura for advice regarding his "interest in investing in commercial properties in Hawaii." TAC ¶ 11, Dkt. No. 55.

---

[2]"The Subject Property is income producing, and its industrial uses include warehousing, general office use, a service station and convenience store, and retail sale of gasoline, motor fuels, and sundries, some of which is subleased by [Dairy Road]." TAC ¶ 9, Dkt. No. 55.

Apparently, the two became friends, Nakamura "acquaint[ed] Cheng with the Subject Property," and based on Cheng's "promises that Cheng and [Maui Gas] could financially assist" Plaintiffs with their defaulted ASB Loan, Cheng, Nakamura and ASB began to negotiate a deal. TAC ¶ 11, Dkt. No. 55.[3] Cheng represented to Nakamura and others "that Cheng was going to buy the ASB Loan on [Plaintiffs'] behalf to help [Dairy Road] gain some time to refinance or sell" (TAC ¶ 16) and to stop the Foreclosure Action (TAC ¶ 14). To this end, Cheng emailed a $300,000 purchase price proposal to ASB on September 20, 2014. TAC ¶ 15, Dkt. No. 55; *see* TAC, Ex. B, Dkt. No. 55-4 at 2–3. On October 29, 2014, after negotiations, Cheng successfully purchased the ASB Loan, announcing to Plaintiffs that, "ASB accepted my offer—$400k," and "We are ON." TAC, Ex. E ["We are ON" E-mail], Dkt. No. 55-4 at 27.

In their latest pleadings, Plaintiffs also describe a "luncheon meeting called by Cheng at a restaurant in Lahaina," attended by Cheng, Nakamura, Garth Nakamura, and others, which allegedly represents when "[t]he entire episode with Cheng and the Plaintiffs began." TAC ¶¶ 35–36, Dkt. No. 55. Although the exact timing of this luncheon meeting is unclear, it necessarily pre-dated Cheng's

---

[3]The following summary of the parties' "negotiation" process is based solely on the contents of the TAC and its exhibits. Further background facts revealed elsewhere in the record are discussed in relation to the TAC's factual allegations, *infra*.

purchase of the ASB Loan on October 29, 2014. *See* TAC ¶¶ 19–20, Dkt. No. 55.

According to the TAC:

> 37.  Cheng told everyone at the luncheon meeting that he liked Nakamura and wanted to help Nakamura by contemporaneously buying the Note from ASB at a discount and working with Nakamura whereby Cheng would allow Nakamura to buy back the property from him immediately, but in order to do so Cheng said he needed information on the property contemporaneously detailed in Paragraph 19 above. Those promises were not future promises but present promises to buy the ASB mortgage loan now, to stop the foreclosure now, to give Nakamura binding buy back options now, which triggered Plaintiffs' reliance and change of position and induced their conduct now.
>
> 38.  At that luncheon meeting at the restaurant Cheng specifically told everyone: "I want to help you guys." "I'll be much easier to deal with than any bank." He then insisted on a handshake "to solidify the deal." I will scare ASB about possible environmental contamination and ASB will offer me a better deal."

TAC ¶¶ 37–38, Dkt. No. 55 (alleging further that "[e]veryone attending the luncheon was impressed by Cheng and reasonably believed that Cheng wanted to help Nakamura" (TAC ¶ 39)).

Upon concluding negotiations with ASB over the loan purchase, Cheng turned to negotiating a loan modification with Dairy Road. As part of that process, he introduced Choi, Dairy Road's attorney, to both Alice Wong, his partner in Texas, and Anthony Barbieri, his attorney. *See* TAC ¶ 23, Dkt. No. 55 (referring to Wong as Cheng's Texas "accountant"). "[D]uring all of the cooperation,

information sharing, and back-and-forth written correspondence and offers that ensued, there was no indication that Cheng would take over the ASB note and ASB's position as foreclosing plaintiff [in the Foreclosure Action] and by credit bidding at auction take over the [Subject] [P]roperty and evict Nakamura and [Dairy Road]." TAC ¶ 40, Dkt. No. 55.

As of December 10, 2014, Plaintiffs acknowledge that "Cheng was still offering [Dairy Road at least] three options" to buy back the loan:

I met with my partners and we are amenable to the following options:

If you do not want to make a deal, we will go immediately to foreclosure. We will sell to the highest bidder at the auction. If no one comes, then we will keep it and hire someone to run the operations.

If you do want to make a deal, we offer the following 3 Options:

Option 1: 12 months and we give you a one time 30 day window to buy us out at the 12th month for $500,000. Monthly payment is: $7,500.00 per month in the interim. Buyout price is at $500,000.00.

Option 2: 24 months and we give you a one time 30 day window to buy us out at the 24th month. Monthly payment is $7,500 for the first 12 months, and then $9,000 per month for the 2nd twelve months, Buyout price is at $560,000.00.

Option 3: 36 months and we give you a one time 30 day window to buy us out at the 36th month. Monthly payment is $7,500 for the first 12 months, and then $9,000 per month for the 2nd twelve months and $11,000 per month for the third twelve months, Buyout price is at $620,000.00 at the 36th month window.

After 36 months, if no buyout takes place, we will foreclose but we will always entertain an offer to extend the lease.

> Buyout price is the same for each 12 month period whether you pay us off at the first or the last month of each 12 month period.
>
> Nakamura to remediate immediately and or obtain clean Health Department permit to operate.
>
> No financing allowed on any of the leasehold properties or against any leases during the time of lease.
>
> Paul Cheng

TAC, Ex. F, Dkt. No. 55-4 at 28–30 [hereinafter Options Email]; TAC ¶ 26, Dkt. No. 55; *see also* TAC, Ex. F, Dkt. No. 55-4 at 28 (forwarding Options Email to Garth Nakamura).

Barbieri sent a draft loan modification agreement to Choi on December 24, 2014. TAC, Ex. J, Dkt. No. 55-5 at 21–40 (email), 23–40 ("First Loan Modification Agreement"). Plaintiffs contend by that time, Cheng was "fully aware that the property was fully protected by insurance . . . except for boilerplate conditions" that Nakamura allegedly "never had a chance to satisfy because days later Cheng acted like he never knew Nakamura." TAC ¶ 41, Dkt. No. 55; *see* TAC, Ex. H, Dkt. No. 55-4 at 34 (Nov. 6, 2014 email), 35–41 (Sept. 19, 2014 "Reservation of Rights to Provide Coverage" letter from Berkeley Insurance to Garth Nakamura)). The pleadings also state that "[t]here were conditions to be satisfied in the 'First Loan Modification Agreement,' but those conditions were

conditions subsequent and not conditions precedent to contract." TAC ¶ 41, Dkt. No. 55.

Just a few days after sending the draft, Cheng, "through his Texas attorney[,] was still asking Nakamura and [Dairy Road] to sign a 'First Loan Modification Agreement.'" TAC ¶ 41, Dkt. No. 55. However, Plaintiffs contend that "when Choi . . . inquired of Barbieri as to Nakamura's deal with Cheng, [Barbieri] inconsistently emailed Choi back: 'What option?'—making it clear that Cheng had never intended to go forward with his promises." TAC ¶ 29, Dkt. No. 55.

At some point shortly thereafter, negotiations over the loan modification agreement ceased. That is evident because, on January 12, 2015, Cheng's attorney contacted the court in the Foreclosure Action and advised that Maui Gas was the "new owner of the ASB Loan" and would presumably be substituting in place of ASB as plaintiff. TAC ¶ 30, Dkt. No. 55. Moreover, "on May 14, 2015, [Maui Gas] filed for summary judgment against [Dairy Road] and against Nakamura for the entire principal loan balance as well as an immediate money judgment against Nakamura [as Guarantor], subsequently awarded in the amount of $1,270,933.79." TAC ¶ 31, Dkt. No. 55.

*Procedural History*

Plaintiffs initiated the instant lawsuit on November 16, 2016. Compl., Dkt. No. 1. Defendants filed a joint Motion to Dismiss on April 10, 2017. *See* Dkt. No.

21.  On May 22, 2017, in addition to filing their Memorandum in Opposition to the April 10, 2017 motion (Dkt. No. 27), Plaintiffs filed a "First Amended Complaint" (Dkt. No. 28) without leave of court, followed by a belated Ex Parte Motion for Leave to File First Amended Complaint on May 23, 2017 (Dkt. No. 29).  After a June 19, 2017 scheduling conference before the Magistrate Judge (*see* EP, Dkt. No. 37), the Magistrate Judge denied the Ex Parte Motion (Dkt. No. 36).

On July 6, 2017, the Magistrate Judge signed a Stipulation Regarding First Amended Complaint and Order (Dkt. No. 39), in which the parties agreed that the May 22, 2017 complaint would "be deemed withdrawn without prejudice." Pursuant to the same Stipulation and Order, Plaintiffs then filed another amended complaint, which they styled as a "Refiled First Amended Complaint."[4]  The SAC asserted claims for Fraud/Misrepresentation, Breach of Contract, Promissory Estoppel, Specific Performance, and Breach of Fiduciary Duty.  SAC ¶¶ 34–42, Dkt. No. 40.

Attached as Exhibit 7 to the SAC were several hundred pages of e-mail communications, setting forth Dairy Road's negotiations with Maui Gas.  *See* SAC, Ex. 7.1, Dkt. No. 40-8 (including emails dated Sept. 23, 2014 to Dec. 23, 2014); SAC, Ex. 7.2, Dkt. No. 40-9 (emails from Dec. 11 to Dec. 29, 2014); SAC,

---

[4]As indicated above, the Refiled First Amended Complaint (Dkt. No. 40) is hereinafter referred to as the Second Amended Complaint or "SAC."

Ex. 7.3, Dkt. No. 40-10 (emails from Sept. 9 to Dec. 24, 2014); and SAC, Ex. 7.4, Dkt. No. 40-11 (emails from Sept. 18, 2014 to Dec. 11, 2014). On March 9, 2018, this Court granted Defendants' motion to dismiss the SAC, permitting leave to amend only Plaintiffs' claims except for Fraud/Misrepresentation. Order Granting Defs.' Mot. to Dismiss Refiled First Am. Compl. at 3 n.2, Dkt. No. 54 [hereinafter Order Dismissing SAC].

On April 9, 2018, Plaintiffs filed their Third Amended Complaint (Dkt. No. 55), setting forth the basis for Dairy Road's re-asserted allegations of fraud and/or misrepresentation. Conspicuously absent from the exhibits attached to the TAC, however, are a majority of the e-mail communications provided in SAC Exhibit 7. Instead, the TAC attaches a handful of specific e-mails, each as a separate exhibit that is devoid of context offered by the surrounding e-mail "threads" previously visible to the Court via SAC Exhibit 7, including—Cheng's October 29, 2014 "We are ON" Email (TAC, Ex. E, Dkt. No. 55-4 at 26–27); Garth Nakamura's November 6, 2014 e-mail attaching the September 19, 2014 "Reservation of Rights to Provide Coverage" letter from Berkeley Insurance (TAC, Ex. H, Dkt. No. 55-4 at 34 (e-mail), 35–41 (ins. letter)); Cheng's December 10, 2014 "Options Email" to Choi, which was forwarded to Garth Nakamura the same day (TAC, Ex. F, Dkt. No. 55-4 at 28–30); and Barbieri's December 24, 2014 e-mail to Choi, attaching an

unsigned, undated copy of the "First Loan Modification Agreement" (TAC, Ex. J, Dkt. No. 55-5 at 21–22 (e-mail), 23–40 (unsigned agreement)).

Defendants filed their Motion to Dismiss the TAC on April 23, 2018. MTD, Dkt. No. 56. Defendants contend that Plaintiffs' operative pleading once again fails to plead a viable fraud claim, and that even if it did, Plaintiffs' fraud claim is foreclosed by the TAC's own exhibits as well as the exhibits Plaintiffs offered with the July 2017 SAC. Mem. in Supp. of MTD the TAC at 3, 10–12, 16, 25–26, Dkt. No. 56-1. Plaintiffs opposed the MTD on May 25, 2018 (Mem. in Opp. to MTD the TAC, Dkt. No. 58), to which Defendants replied on June 1, 2018 (Reply in Supp. of MTD the TAC, Dkt. No. 59). The Court elected to adjudicate the MTD without a hearing under Local Rule 7.2. Entering Order, Dkt. No. 60. The instant disposition follows.

## LEGAL STANDARDS

*Motion To Dismiss Pursuant To Federal Rule Of Civil Procedure 12(b)(6)*

The Court may dismiss a complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) for "failure to state a claim upon which relief can be granted" when there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In other words, plaintiffs are required to allege "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Factual allegations that only permit the Court to infer "the mere possibility of misconduct" do not constitute a short and plain statement of the claim showing that the pleader is entitled to relief as required by FRCP 8(a)(2). *Id.* at 677, 679 (explaining that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

Courts considering a motion under Rule 12(b)(6) are generally limited to reviewing the contents of the complaint. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). If matters outside the pleadings are considered, the Rule 12(b)(6) motion is treated as one for summary judgment. *See Keams v. Tempe Tech. Inst., Inc.*, 110 F.3d 44, 46 (9th Cir. 1997); *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). Courts may, however, "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint,

or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Documents whose contents are alleged in a complaint and whose authenticity is not questioned by any party may also be considered in ruling on a Rule 12(b)(6) motion. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Heartland Payment Sys., Inc. v. Cent. Pac. Bank*, 2012 WL 488107, *2 (D. Haw. Feb. 13, 2012).

For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (explaining that the construed-as-true/light-most-favorable tenet "is inapplicable to legal conclusions"); *Sprewell*, 266 F.3d at 988; *see also Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . , a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Moreover, the court need not accept as true allegations that contradict matters

properly subject to judicial notice, nor must it assume that allegations contradicted by the exhibits attached to the complaint are true. *Sprewell*, 266 F.3d at 988. Rather, the Ninth Circuit has explained, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

*Motion To Dismiss Under FRCP 9(b)*

Claims sounding in fraud must also satisfy FRCP Rule 9(b), which requires a party to "state with particularity" the circumstances constituting fraud. "[C]ircumstances must be alleged with enough specificity "to give defendants notice of the particular misconduct . . . so they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted)). To that end, Rule 9(b) demands detailed allegations setting forth "the time, place, and nature of the alleged fraudulent activities." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *see also Illinois Nat'l Ins. Co. v. Nordic PCL Const., Inc.*, 870 F. Supp. 2d 1015, 1036–37 (D. Haw. 2012) (explaining that allegations of fraud "must be accompanied by 'the who, what, when, where, and how' of the misconduct charged") (quoting *Vess v. Ciba-Geigy Corp. USA*, 317

F.3d 1097, 1106 (9th Cir. 2003)). "[M]ere conclusory allegations of fraud are insufficient." *Moore*, 885 F.2d at 540.

"Because a dismissal of a complaint or claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner." *Vess*, 317 F.3d at 1107.

*Leave to Amend*

Under Rule 15(a)(2) of the FRCP, leave to amend a party's pleading "should [be] freely give[n] . . . when justice so requires." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (explaining that "the underlying purpose of [FRCP] Rule 15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities") (quoting *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987)). Further, the Ninth Circuit has explained that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962; *Erlich v. Glasner*, 352 F.2d 119, 122 (9th Cir. 1965)). Nonetheless, leave to amend may be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

14

allowed, undue prejudice to the opposing party by virtue of allowance of the

amendment, futility of amendment, etc." *Mayes v. Leipziger*, 729 F.2d 605, 608

(9th Cir. 1984) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## DISCUSSION

I.   **The Scope Of Review**

"Generally, the scope of review on a motion to dismiss for failure to state a

claim is limited to the contents of the complaint," *Marder*, 450 F.3d at 448 (citing

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n. 5 (9th Cir. 2003)),

which includes any exhibits attached to the pleadings.[5]  *See* FRCP 10(c); *Oxendine*

*v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001).  If "matters outside the pleadings

are presented to and not excluded by the court," the motion must generally be

treated as one for summary judgment under FRCP 56.  *See* FRCP 12(d); *Kyne v.*

*Ritz-Carlton Hotel Co.*, 835 F. Supp. 2d 914, 922 (D. Haw. 2011) (citing *Bank*

*Melli Iran v. Pahlavi*, 58 F.3d 1406, 1408 (9th Cir. 1995)).

Courts may, however, "consider certain materials—documents attached to

the complaint, documents incorporated by reference in the complaint, or matters of

judicial notice—without converting the motion to dismiss into a motion for

summary judgment." *Ritchie*, 342 F.3d at 908; *S.E.C. v. Lyndon*, 27 F. Supp. 3d

---

[5]The "pleadings" include the complaint, answer to the complaint, and if the court orders one, a
reply to an answer."  FRCP 7(a).

1062, 1072 (D. Haw. 2014) (citing *Ritchie*, *supra*); *cf. Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("On a motion to dismiss, we may consider materials incorporated into the complaint or matters of public record.") (citing, *inter alia*, *Intri–Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007)).

A. ***Incorporation By Reference***

The Federal Rules of Civil Procedure allow for incorporation of the contents of a superseded complaint, including any exhibits attached thereto, where those contents are referenced in subsequent pleadings. FRCP 10(c) ("Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion."); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (explaining that courts ruling on 12(b)(6) motions to dismiss may take into consideration "documents incorporated into the complaint by reference"). "[T]he mere mention of the existence of a document," however, is "insufficient." *Coto Settlement*, 593 F.3d at 1038 (citing *Ritchie*, 342 F.3d at 908–09)). Indeed, incorporation by reference ordinarily occurs only where the superseding complaint's reference is "direct and explicit in order to enable the responding party to ascertain the nature and extent of the incorporation." 5A

Charles Alan Wright et al., Federal Practice & Procedure § 1326 (3d ed. 2004) (collecting cases).[6]

The Ninth Circuit also considers extrinsic documents on which the complaint "necessarily" relies to be incorporated by reference. *Marder*, 450 F.3d at 448. That is, where "the complaint necessarily relies upon [the] document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance[,]" the court may consider that documentary evidence as part of its Rule 12(b)(6) review, even where those documents are not attached to the pleadings. *Coto Settlement*, 593 F.3d at 1038 (citing, *inter alia*, *Knievel*, 393 F.3d at 1076); *see Tunac v. United States*, --- F.3d --- , 2018 WL 3614044, *8 (9th Cir. July 30, 2018) ("Although 'mere mention of the existence of a document is insufficient to incorporate the contents of a document,' the document is incorporated when its contents are described and the document is 'integral' to the complaint." (quoting *Coto Settlement*, *supra*)); *cf. Warren*, 328 F.3d at 1141 n.5 ("[W]hile a court must

---

[6] *Compare, e.g.*, *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1176 (5th Cir. 2006) (holding that claims from original complaint not re-asserted in an amended complaint were incorporated by reference into the amended complaint where there was no indication that either the defendant or the court was confused about the nature and extent of the incorporation because, in part, "the [incorporating] clause was sufficiently specific, and the pleading history of the case sufficiently simple" (citation omitted)), *with United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 462 (E.D.N.Y. 2007) ("The Government's failure to specifically identify which portions of the hundreds of pages of exhibits it intends to incorporate by reference into the Amended Complaint makes it impossible for the Court or the defendants to ascertain the nature and extent of the incorporation, and the purported incorporation is therefore invalid.").

generally refrain from considering extrinsic evidence in deciding a 12(b)(6) motion, it may consider documents on which the complaint "necessarily relies" and whose "authenticity . . . is not contested.") (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)); *Fecht v. The Price Co.*, 70 F.3d 1078, 1080 n.1 (9th Cir. 1995) ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.") (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.), *cert. denied*, 512 U.S. 1219 (1994), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)), *cert. denied*, 517 U.S. 1136, (1996).[7]

If the rule were otherwise, a plaintiff with a deficient claim could survive a Rule 12(b)(6) motion "by not attaching a dispositive document upon which the plaintiff relied," *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997), or "by deliberately omitting references to documents upon which [plaintiff's] claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 705, 706 n.4 (9th Cir. 1998) (citing *Pension Benefit Guar. Corp. v. White Consol.*

---

[7]Incorporation by reference is particularly common where a copy of the extrinsic document relied upon is attached to the defendant's Rule 12(b)(6) motion. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the [pleadings], a court may consider evidence on which the 'complaint "necessarily relies" if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion.'" (quoting *Marder*, 450 F.3d at 448)).

*Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)), *rev'd by statute on other grounds*, 28 U.S.C. § 1453(b), *as recognized in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006) (per curiam).  Further, "[w]hen a complaint refers to a document and the document is central to the plaintiff's claim, the plaintiff is obviously on notice of the document's contents," so the rationale for conversion to summary judgment—to allow the plaintiff an opportunity to respond in kind— "dissipates."  *GFF Corp.*, 130 F.3d at 1385; *see Parrino*, 146 F.3d at 706 n.4 ("Where . . . an attached document is integral to the plaintiff's claims and its authenticity is not disputed, the plaintiff 'obviously is on notice of the contents of the document and the need for a chance to refute evidence is greatly diminished.'" (quoting *Pension Benefit Guar. Corp.*, 998 F.2d at 1196–97)).

These principles are on evident display here.  As part of their SAC, Plaintiffs attached hundreds of emails at SAC Exhibit 7.  *See* Dkt. Nos. 40-8, 40-9, 40-10, and 40-11.  These emails chronicled the negotiations history between ASB and Cheng on the one hand, and between Cheng and Plaintiffs on the other.  The Court highlighted many of these emails in its Order dismissing the SAC (Dkt. No. 54), explaining how Plaintiffs' fraud and misrepresentation claim was contradicted by the very record they relied on and appended to their pleadings.  Now, in a transparent attempt to survive Rule 12(b)(6), Plaintiffs simply omit the majority of those emails from the TAC, instead relying on a select few that lack the context of

the complete record Plaintiffs previously filed. Plaintiffs' subterfuge reaches no different result for several reasons.

First, while not appending the majority of emails comprising SAC Exhibit 7, the TAC explicitly refers to them. Dairy Road asserts that "an exchange of several hundred pages of email correspondence between Cheng and Choi and Nakamura's [s]on Garth Nakamura and Cheng's Texas accountant Alice Wong and his Texas Attorney Anthony Barbier[i]" "starting approximately September 17, 2014 and terminating on December 26, 2014" (TAC ¶ 16) contains evidence that "Cheng specifically [told] Nakamura that upon acquiring the ASB [L]oan[,] Cheng would not foreclose but instead give Nakamura time to refinance" (TAC ¶ 17).[8] The TAC also states that "[a]ll of [the] assurances and representations and reliances are fully documented and embodied in detail throughout . . . nearly four months of emails variously exchange in the correspondence between Cheng, Choi, Wong and/or Barbieri during the months of September, October, November and December 2014." TAC ¶¶ 23, 40 (referring to "all of the cooperation, information sharing, and back-and forth written correspondence and offers" between the parties). From these statements, it is evident both that the TAC "necessarily relies upon" the four-months-long e-mail exchange, *Coto Settlement*, 593 F.3d at 1038

_____

[8] The contents of these emails, including whether they are what Plaintiffs purport them to be, are discussed, *infra*.

(citing, *inter alia*, *Knievel*, 393 F.3d at 1076; *Parrino*, 146 F.3d at 705, 706 n.4); *Warren*, 328 F.3d at 1141 n.5 (citing *Lee*, 250 F.3d at 688), and that the exchange "contents are alleged" in the pleadings, *Fecht*, 70 F.3d at 1080 n.1 (citing *Branch*, 14 F.3d at 454).

Second, the TAC quotes from portions of SAC Exhibit 7 not otherwise provided with the TAC's attachments. *See, e.g.*, TAC ¶ 29, Dkt. No. 55 ("On December 29, 2014, when Choi, for instance, inquired of Barbieri as to Nakamura's deal with Cheng, [Barbieri] inconsistently emailed Choi back: 'What option?'—making it clear that Cheng had never intended to go forward with his promises to Nakamura, but from the beginning had lied to Nakamura[.]"). Doing so enables the Court to "consider the full text" of the email exchange in ruling on the motion to dismiss. *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997) ("[A] court ruling on a motion to dismiss may consider the full texts of documents which the complaint quotes only in part.") (citing *Fecht*, 70 F.3d at 1080 n.1; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996)).

Third, there is nothing in the record indicating that either party disputes the authenticity of the four-months-long email exchange reproduced in full in SAC Exhibit 7. In fact, Plaintiffs acknowledge that they included those materials with the SAC in order to provide the Court with "a complete statement of the underlying facts" and to offer "the written evidence of what became in effect a

joint venture leading up to an attractive, highly discounted buyout of the ASB mortgage loan, at first supposedly for the mutual benefit of all parties." Mem. in Opp. to MTD the SAC at 18, Dkt. No. 45. Dairy Road therefore "obviously is on notice of the contents" of the four months of e-mails and does not quarrel with their authenticity, such that the Court need not convert the MTD into a motion for summary judgment. *GFF Corp.*, 130 F.3d at 1385; *see Parrino*, 146 F.3d at 706 (citation omitted) (considering letter submitted by defendants in ruling on 12(b)(6) motion where the amended complaint "frequently referred to and quoted from the letter, and alleged that the letter alone satisfied the statute of frauds," and the plaintiff also "referred to the letter (in some instances as the contract itself) throughout its brief").

Accordingly, the contents of SAC Exhibit 7 are incorporated by reference into the TAC and may be considered by the Court in evaluating Defendants' motion, without converting the MTD into a motion for summary judgment. *See, e.g.*, *Prince-Rivers v. Fed. Express Ground*, 731 Fed. Appx. 298, § II(B) n.2 (5th Cir. 2018) (per curiam) (noting that the court could still consider the content of an EEOC Charge of Discrimination, which had been attached to previous, superseded versions of the complaint, but which was not attached to the latest version, because "[t]he charge was referenced in the [operative] complaint . . , was attached to [a]

motion to dismiss, and is essential to the legal argument at issue." (citation omitted)).[9]

B.    ***Judicial Notice***

Under Federal Rules of Evidence ("FRE") 201(b)(2), a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Courts considering motions to dismiss may therefore take judicial notice of "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" without the need to convert the dismissal motion into a motion for summary judgment.  5A Wright & Miller § 1357, at 299; *see United States v. 14.02 Acres of Land More or Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir. 2008) (citing *Lee*, 250 F.3d at 688); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–82 (7th Cir. 1997) ("In ruling on a motion to dismiss, the court may take judicial notice of matters of public record, including pleadings and orders in previous cases."

---

[9] *Compare Parrino*, 146 F.3d at 706 (considering "FHP Group Application Plan" attached to motion to dismiss that was "crucial to plaintiff's claims, but not explicitly incorporated in [the] complaint," where the original complaint and first amended complaint "both ma[de] reference to the FHP 'group plan' and its 'cost containment program,'" "[b]ecause [plaintiff's] claims rest[ed] on his membership in FHP's plan and on the terms of the plan," and because "[t]he FHP Group Application plan includes key terms regarding the plan covering [plaintiff], and its authenticity was not disputed by the parties"), *with Cooper*, 137 F.3d at 623 (holding that transcripts could not be considered in ruling on a motion to dismiss because, although the complaint contained "allegations about the conference calls," it did "not expressly mention or refer to the transcripts, or even identify their existence," and, in fact, "the transcripts themselves apparently did not exist at the time plaintiffs filed their complaint").

(collecting cases in support)). Facts are considered to be readily ascertainable for this purpose where, among other things, neither party has opposed them. *See, e.g.*, *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978) (taking judicial notice of depositions made part of the record in prior proceedings where, among other things, opposing party "did not object" to such notice).

Here, the parties have never disputed the authenticity or reliability of SAC Exhibit 7's contents. In fact, both parties relied on those contents in arguing Defendants' Motion to Dismiss the SAC. *See, e.g.*, Mem. in Supp. of MTD the SAC at 2–3, 7–11, 14, 16–17, 22, 24, Dkt. No. 41-1 (quoting from and citing to various e-mails contained in SAC Exhibit 7); Mem. in Opp. to MTD the SAC at 18–20, Dkt. No. 45 (explaining that the contents of SAC Exhibit 7 offer "a complete statement of the underlying facts" and constitute "written evidence" of the alleged negotiated agreement, and quoting from several of SAC Exhibit 7's emails contained therein); Reply in Supp. of MTD the SAC at 1–2, 4–6, 7–8, 10–11, Dkt. No. 46. Defendants also support their current motion to dismiss with reference to SAC Exhibit 7. *See, e.g.*, Mem. in Supp. of MTD the TAC at 10–12, 16–17, 25–26, Dkt. No. 54 (quoting from SAC Exhibit 7 via this Court's Order Dismissing SAC); Reply in Supp. of MTD the TAC at 3–4, Dkt. No. 59.

SAC Exhibit 7 is also part of the Court-generated record in this case insofar as the Order Dismissing SAC extensively quotes its contents. *See* Order

Dismissing SAC at 2–15, Dkt. No. 54 (reciting background facts relevant to this matter in detail). This also renders those contents open to consideration in deciding the instant Rule 12(b)(6) motion. *See, e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (drawing its background facts from the "court's recitation of similar allegations" made in an order in another, related case, and granting request to "take judicial notice of [briefs, a hearing transcript, and] several other pleadings, memoranda, expert reports, etc," because "[w]e may take judicial notice of court filings and other matters of public record") (citing *Holder v. Holder*, 305 F.3d 584, 866 (9th Cir. 2002); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F. Supp. 1360, 1364 (9th Cir.), *cert. denied*, 525 U.S. 873 (1998)); *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 71–74 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001)); *cf. Kinnett Dairies*, 580 F.2d at 1279 n.35 (explaining that its recitation of the facts in the matter "is culled from several record sources," including at least one report not otherwise admitted into evidence during prior proceedings).

Accordingly, the doctrines of incorporation by reference and judicial notice each permit this Court to consider the contents of SAC Exhibit 7 in adjudicating the instant MTD without converting it into a motion for summary judgment. *See, e.g.*, *Am. Auto. Ins. Co. v. Haw. Nut & Bolt, Inc.*, 2016 WL 8677213, *1 n.1 (D. Haw. Dec. 16, 2016) (taking judicial notice of underlying complaint and insurance

policies attached to the motion to dismiss, and noting that consideration of those documents, which are referenced in the pleadings, was also appropriate under "incorporation by reference") (citing FRE 201; *Coto Settlement*, 593 F.3d at 1038)), *adhered to*, 2017 WL 5892255 (D. Haw. Sept. 27, 2017).

## II.     **Plaintiffs' Fraud/Misrepresentation Claim Is Still Insufficiently Pled**.

"[F]raud in the inducement is fraud which induces the transaction by misrepresentation of motivating factors such as value, or extent, usefulness, age, or other characteristic of the property." *Schmidt v. Fid. Nat'l Title Ins. Co.*, 2009 WL 10676787, *12 (D. Haw. Sept. 30, 2009) (quoting *Adair v. Hustace*, 640 P.2d 294, 299 (Haw. 1982), *abrogated by Ass'n of Apt. Owners of Royal Aloha v. Certified Mgmt., Inc.*, 386 P.3d 866 (Haw. 2016), *as amended*) (internal brackets omitted). In Hawai'i, a party claiming fraud must establish four elements: "(1) false representations were made by defendants, (2) with knowledge of their falsity . . . , (3) in contemplation of plaintiff's reliance [thereon], and (4) plaintiff did rely on them." *Shoppe v. Gucci Am., Inc.*, 14 P.3d 1049, 1067 (Haw. 2000) (quoting *TSA Int'l, Ltd. v. Shimizu Corp.*, 990 P.2d 713, 725 (Haw. 1999), *as amended*).  The party claiming fraud bears the burden to "establish these elements by clear and convincing evidence." *TSA Int'l*, 990 P.2d at 725 (quoting *Hawaii's Thousand Friends v. Anderson*, 768 P.2d 1293, 1301 (1989)) (additional citations omitted). The TAC falls short on all these fronts.

Plaintiffs have maintained that the "very central essence" of the parties' agreement was that Defendants would "stop any foreclosure so as to provide [Plaintiffs] with breathing room and refinancing options." TAC ¶ 31, Dkt. No. 55. Specifically, Plaintiffs allege that "in order to induce immediate change of behavior," "Cheng and his attorneys and accountants" made statements misrepresenting "contemporaneously" that: (1) Defendants "intended to help" Plaintiffs (TAC ¶ 44(a)); (2) Defendants "would purchase the ASB [L]oan indirectly for" Plaintiffs (TAC ¶ 44(b)); (3) Defendants "would give [Plaintiffs] time to buy back the property" (TAC ¶ 44(c)); (4) Plaintiffs "would have three options for buying back the property and that they could choose any one of the three" (TAC ¶ 44(d)); (5) "upon the purchase of the ASB [L]oan," Defendants "would not foreclose" and would dismiss the Foreclosure Action (TAC ¶ 44(e)); (6) "there would be no foreclosure deficiency judgment against" Plaintiffs (TAC ¶ 44(f)); and (7) Plaintiffs "would benefit from the discounted price negotiated and paid to ASB" (TAC ¶ 44(g)).[10]

Plaintiffs contend that they "were damaged as a result of" these seven "false promises" by: being "induced contemporaneously not to seek a buyout of their mortgage directly with ASB for the same significantly reduced buy out price

---

[10]These seven misrepresentations are identical to those alleged in the SAC, except that Plaintiffs now specify that each is an example of Defendants "contemporaneously" misrepresenting something "in order to induce immediate change of behavior." *Compare, e.g.*, SAC ¶ 34(a), Dkt. No. 40, *with* TAC ¶¶ 44(a)–(g), Dkt. No. 55.

secured by Cheng" (TAC ¶ 45(a)); "agree[ing] that ASB could deal directly with Cheng" and "provid[ing] ASB with assurances through Cheng that they would not sue ASB for selling their mortgage loan to him" (TAC ¶ 45(b)); "shar[ing] their proprietary and confidential business information with Cheng" (TAC ¶ 45(c)); "s[eeking] other means of refinancing with their other investors and close friends" (TAC ¶ 45(d)); "incur[ing] legal fees and costs hiring attorneys to arrange contract terms with Cheng and his attorneys and accountants in Texas" (TAC ¶ 45(e)); forgoing "buyers for their businesses on the property" (TAC ¶ 45(f)); and "defend[ing] against ASB on claims that they had against ASB as foreclosing plaintiff had they not spent all of their money for attorneys dealing with Cheng in the second half of 2014" (TAC ¶ 45(g)).

Defendants argue that these allegations—although somewhat more detailed than their previous counterparts in the SAC—still fail to plead a viable claim for either Misrepresentation or Fraud under the stringent pleading requirements set forth in Rule 9(b) of the FRCP. *See* Mem. in Supp. of MTD the TAC at 19–24, Dkt. No. 56-1. Defendants are correct.

## A. *Rule 9(b) Pleading Requirements For Fraud*

"An allegation of fraud is sufficient" under Rule 9(b) "if it 'identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'" *Heartland*, 2012 WL 488107 at *4 (quoting

*Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)). To sufficiently "identif[y] the circumstances constituting fraud," a plaintiff must identify facts providing details of the alleged fraudulent activity such as times, dates, and places. *Neubronner*, 6 F.3d at 672 (citing *Gottreich v. San Francisco Inv. Corp.*, 552 F.2d 866, 867 (9th Cir. 1977); *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)); *Moore*, 885 F.2d at 540. Moreover, beyond setting forth the objective facts necessary to identify the allegedly fraudulent statements or transactions, a plaintiff "must set forth what is false or misleading about [a given] statement, and why it is false." *Vess*, 317 F.3d at 672 (quoting *Decker v. GlenFed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994)).[11]

Here, the seven "misrepresentations" described in the pleadings do not meet these standards. Plaintiffs generally assert that "[a]ll of the above assurances and representations and reliances are fully documented and embodied in detail throughout the above-referenced nearly four months of emails variously exchanged in the correspondence, between Cheng, Choi, Wong and/or Barbieri during the

---

[11]Striking a balance "between the need to protect defendants from having to defend factually baseless litigation and the need to afford plaintiffs an adequate opportunity to develop factual bases for legitimate claims" via discovery, the Ninth Circuit has held that "Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge." *Neubronner*, 6 F.3d at 672 (citing *Wool v. Tandem Comps. Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987); *Moore*, 885 F.2d at 540; *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247–48 (2d Cir. 1987); *In re Worlds of Wonder Secs. Litig.*, 694 F. Supp. 1427, 1433 (N.D. Cal. 1988)). However, "this exception does not nullify Rule 9(b)," for even when "allegations of fraud [are] based on information and belief," the pleadings nonetheless "do not satisfy Rule 9(b) if the factual bases for the belief are not included." *Heartland*, 2012 WL 488107 at *4 (citing *Neubronner*, 6 F.3d at 672).

months of September, October, November, and December 2014." TAC ¶ 23, Dkt. No. 55. In other words, just as they did in the SAC, Plaintiffs once again rely heavily on SAC Exhibit 7 to make their case.[12] As this Court previously noted, however, the negotiations history chronicled in the emails cited by Plaintiffs do nothing of the sort. *See, e.g.*, Order Dismissing SAC at 31, Dkt. No. 54 ("There is nothing fraudulent or misleading" about Cheng's email announcing to Plaintiffs that "We are ON" "because that is precisely what Plaintiffs' voluminous record demonstrates Cheng did"). An additional example of that is Plaintiffs' continued complaint that Cheng falsely promised to provide at least three buyback options with Plaintiffs being allowed to choose from among any of the three. The record evidences that Cheng did exactly that. Cheng did provide three buyback options from which Plaintiffs could have selected. TAC, Ex. F, Dkt. No. 55-4 at 28–30 ("We offer the following 3 options"). Plaintiffs may not have been amenable to the choices, but they were certainly offered. In short, Plaintiffs' own record largely contradicts their protestations of fraud by failing to evidence falsities perpetrated by Defendants. *Vess*, 317 F.3d at 672 (requiring plaintiff to explain how a statement is false in order to satisfy Rule 9(b)). Accordingly, the TAC does little to address the pleadings deficiencies previously identified by the Court.

---

[12]The "nearly four months of emails" referenced by Plaintiffs are contained in full in SAC Exhibit 7. *See* Dkt. Nos. 40-8, 40-9, 40-10, and 40-11.

B. ***Common Law Fraud/Misrepresentation***

    1.   *Representations Regarding Future Events Or Predictions Are Not Actionable.*

In most instances, fraud is actionable only if the first element—false (mis)representation—"relate[s] to a past or existing material fact and not the occurrence of a future event." *TSA Int'l*, 990 P.2d at 725 (emphasis omitted) (citing *Stahl v. Balsara*, 587 P.2d 1210, 1214 (1978)). This requirement concerns the subject of the alleged statement itself, and it applies regardless of whether the statement was made in order to induce present action or some action in the future. As the Hawaiʻi Supreme Court has explained:

> Fraud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such a promise.

*Stahl*, 587 P.2d at 1214; *Shoppe*, 14 P.3d at 1068; *see, e.g.*, *Courter v. Karolle*, 2013 WL 2468360, *9 [FOF 16] (D. Haw. June 6, 2013) ("[Defendant's] claim for fraud must fail as a matter of law because the false statement forming the basis of the claim (i.e., that [plaintiff] promised to hold title to [the subject property] in name only, and to allow [defendant] to transfer title back to himself whenever he wished) are promissory in nature and, therefore, insufficient to support a claim for fraud."); *Prim Liab. Co. v. Pace-O-Matic, Inc.*, 2012 WL 263116, *9 (D. Haw.

Jan. 30, 2012) ("[Party]'s contractual promises cannot form the basis of a fraud claim.").

Here, the first three alleged misrepresentations—(1) Defendants intended to help the Plaintiffs[13]; (2) Defendants would purchase the ASB Loan indirectly on Plaintiffs' behalf[14]; and (3) Defendants would give Plaintiffs time to buy back the property[15]—are "promissory in nature and, therefore, insufficient to support a claim for fraud." *Courter*, 2013 WL 2468360 at *9; *see Honolulu Fed. Sav. & Loan Ass'n v. Murphy*, 753 P.2d 807, 813 (Haw. Ct. App. 1988) [hereinafter *HonFed*] ("[B]ecause the bank's alleged representations as to how it intended to go about collecting the note in the event of default were promises as to future acts,

---

[13]*See, e.g.*, TAC ¶¶ 11 ("Nakamura was induced to acquaint Cheng with the Subject Property of [Dairy Road], with promises that Cheng and [Maui Gas] could financially assist him . . . ."); 15 (referring to "Cheng's promise of financial assistance to Nakamura and [Dairy Road]"); 16 ("Cheng represented . . . that Cheng was going to buy the ASB Loan . . . to help [Dairy Road] . . . ."); 37 ("Cheng told everyone at the luncheon meeting that he . . . wanted to help Nakamura . . . ."); 38 ("At the luncheon meeting at the restaurant Cheng specifically told everyone: 'I want to help you guys.'").

[14]*See, e.g.*, TAC ¶¶ 15 (discussing "Cheng's negotiations to acquire the Subject Property with the blessings of [Dairy Road] and indirectly on its behalf"); 16 ("Cheng represented to Nakamura and to Choi and to Garth . . . that Cheng was going to buy the ASB Loan on their behalf . . . ."). *Cf., e.g.*, TAC ¶¶ 18 ("Cheng explained to Nakamura that he . . . needed confidential proprietary information . . . or Cheng could not do the deal on behalf indirectly of Nakamura . . . ."); 42 (noting that Nakamura "believ[ed] that Cheng was in part proceeding as a friend on [Plaintiffs'] behalf").

[15]*See, e.g.*, TAC ¶¶ 16 ("Cheng represented to Nakamura and to Choi and to Garth . . . that Cheng was going to buy the ASB Loan . . . to help [Dairy Road] gain some time to refinance or sell . . . ."); 17 ("Cheng represented that they . . . would be . . . giving [Dairy Road] additional time to work out a refinance or sale . . . ."); 21 (describing Cheng's "promises to give [Dairy Road] contemporaneously the option of paying off its first mortgage *once acquired by Cheng*" (emphasis added)); 24 (referring to "[t]he agreement between the parties . . . to provide additional time for [Dairy Road] to refinance or sell the Subject Property").

they were insufficient as a matter of law to constitute fraud in the procurement of the guaranty." (quoting *Rogers v. C & S Nat'l Bank*, 274 S.E.2d 722, 723 (Ga. Ct. App. 1980)) (internal brackets omitted)). This remains true notwithstanding the language Plaintiffs added to the TAC—specifying that each statement was misrepresented "contemporaneously" and "in order to induce immediate change of behavior." *Compare* TAC ¶¶ 45(a)–(c), Dkt. No. 55, *with* SAC ¶ 34(a), Dkt. No. 40.

Additionally, the TAC's remaining alleged misrepresentations— (4) Plaintiffs would have three buy-back options to choose from[16]; (5) Defendants would not foreclose on Plaintiffs upon the purchase of the ASB Loan[17]; (6) there

---

[16]*See, e.g.*, TAC ¶¶ 24 ("[I]t was not a question of whether the parties could reach agreement, but merely which alternative Nakamura and [Dairy Road] would accept, one of many and at their election or so they and Choi were told by Cheng, Wong, and Barbieri . . . ."); 26 (stating that by October 29, 2014, the parties "accepted and agreed upon virtually every material contract term of their arrangement with only Nakamura needing to elect among proposed alternative refinancing terms," and that Cheng was still offering [Dairy Road] three options in writing as late as December 10, 2014 . . . , telling Nakamura that all he would have to do was pick one, there being no terms not otherwise waived by Cheng and by [Maui Gas]"); 37 (describing Cheng's "present promises" at the luncheon meeting "to give Nakamura binding buy back options now").

[17]*See, e.g.*, TAC ¶ 17 (alleging that "Cheng specifically t[old] Nakamura that upon acquiring the ASB [L]oan Cheng would not foreclose but instead give Nakamura time to refinance"). *Cf., e.g.*, TAC ¶¶ 16 ("Cheng represented . . . that Cheng was going to buy the ASB Loan . . . to help [Dairy Road] gain some time to refinance or sell . . . ."); 21 (describing Cheng's "promises" to "immediately stop[] the Foreclosure Action" and to "give [Plaintiffs] contemporaneously the option of paying off its first mortgage once acquired by Cheng"); 37 ("Cheng told everyone at the luncheon meeting that he . . . wanted to help Nakamura by contemporaneously buying the Note from ASB . . . and . . . allow[ing] Nakamura to buy back the property from him immediately . . . ."); 40 ("[T]here was no indication that Cheng would take over the ASB note and ASB's position as foreclosing plaintiff . . . ."); 43 (describing "false promises that Cheng would . . . . assist Nakamura and [Dairy Road] to save the subject property from foreclosure").

would be no foreclosure deficiency judgment against Plaintiffs[18]; and (7) Plaintiffs

would benefit from the discounted price negotiated and paid to ASB[19]—are each

clearly predictions of future events or expressions of intention, rather than

misstatements of existing fact. *See HonFed*, 753 P.2d at 813; *Stahl*, 587 P.2d at

1213–14 (holding that each of the defendant-astrologer's alleged

misrepresentations were prophesy relating to future events, not material facts that

were actually false at the time the representations were made (citing *Peine v.

Murphy*, 377 P.2d 708, 712 (Haw. 1962)).  The TAC's self-serving conclusion

that these "promises were not future promises but present promises of immediate

present performance" (TAC ¶ 37, Dkt. No. 55) does not make the alleged

misrepresentations any less "promissory in nature," *Courter*, 2013 WL 2468360 at

---

[18] *See, e.g.*, TAC ¶¶ 14 ("Cheng approached Nakamura, proposing to buy [the] ASB Loan and stopping the Foreclosure Action . . . ."); 21 (describing Cheng's "promises to contemporaneously assist [Dairy Road] in immediately stopping the Foreclosure Action"); 24 (referencing "[t]he agreement between the parties to stop any foreclosure sale"); 31 (stating that "the very central essence" of the parties' "agreement" "was to stop any foreclosure so as to provide them with breathing room and refinancing options"); 40 ("[T]here was no indication that Cheng would . . . , by credit bidding at auction take over the property and evict Nakamura and [Dairy Road].").

[19] *See, e.g.*, TAC ¶¶ 14 (describing Cheng's proposal to "buy out the ASB Loan at a discount, which appeared to be a more attractive alternative to Nakamura th[a]n negotiating directly with ASB"); 17 (referring to "Cheng's financial assistance by his discounted purchase of the ASB Loan").  *Cf.* TAC ¶¶ 11 ("Nakamura was induced to acquaint Cheng with the Subject Property of [Dairy Road], with promises that Cheng and [Maui Gas] could financially assist him . . . ."); 25 (describing Cheng's October 29, 2014 email as "triumphantly," stating "that ASB had accepted his steeply discounted, increased buyout offer of $400,000"); 37 (discussing Cheng's statements at the luncheon that he "wanted to help Nakamura by contemporaneously buying the Note from ASB at a discount and working with Nakamura"); 38 ("Cheng specifically told everyone [at the parties' luncheon] . . . [that he would]" scare ASB about possible environmental contamination, resulting in a better deal.).

*9, nor does it change the fact that the promises *did* involve future acts, such as Defendants' alleged promise not to foreclose on the ASB Loan, which was made before Defendants actually acquired that loan and therefore had to have been made in advance of any opportunity by Defendants to honor it, *see HonFed*, 753 P.2d at 813. Similarly, even if Cheng did "specifically t[ell] everyone" at the luncheon meeting: "I will scare ASB about possible environmental contamination" in order to secure a "better deal" (TAC ¶ 38), that statement explicitly involves an expression of intention to act a particular way in the future, and, indeed, Cheng did not even "beg[i]n negotiations to acquire the Subject Property" from ASB until approximately September 20, 2014 (TAC ¶ 15), after the statement was allegedly made.

Plaintiffs thus may not base their claim of fraud/misrepresentation on such promissory statements. *See Heartland*, 2012 WL 488107 at *6 (explaining that the alleged statement that plaintiff "would benefit as a result of [a] 'large and valuable merchant base in Hawaii' . . . does not allege a factual misrepresentation, instead offering a prediction," and noting further that "[i]f [plaintiff] takes issue with [defendant]'s representation that it had a 'large and valuable merchant base,' it fails to allege . . . or explain . . . what makes this statement false").

### 2.    *Evidence Of Fraudulent Intent Is Lacking*.

"Promissory" representations like those advanced in the TAC *may* be actionable as fraud if the representation was made without the present intent to perform. *Eastern Star, Inc., S.A. v. Union Bldg. Materials Corp.*, 712 P.2d 1148, 1159 (Haw. Ct. App. 1985) (citations omitted).  However, there must be some affirmative evidence of fraudulent intent.  *HonFed*, 753 P.2d at 813 (citing *Aloha Petroglyph, Inc. v. Thomas*, 619 P.2d 518, 519 (Haw. Ct. App. 1980)).  And here, just as before, Plaintiffs have not alleged sufficient facts in the TAC to establish that "Cheng had never intended to go forward with his promises to Nakamura." TAC ¶ 29, Dkt. No. 55.  Several examples illustrate this omission.

First, Plaintiffs cite to the October 29, 2014 "We are ON" email (Dkt. No. 55-4 at 27) as evidence that once Cheng had acquired the ASB Loan, "virtually every material contract term of their arrangement" had been agreed upon.  TAC ¶ 26, Dkt. No. 55.  The record, however, demonstrates precisely the opposite. Soon after Cheng's October 29 email, Cheng requested specific information from Plaintiffs necessary to the formation of any buyback agreement.  In fact, the parties exchanged *numerous* emails that made clear a contract between them not only had

yet to be reached, but was uncertain.[20]  Thus, the "We are ON" email hardly

supports Plaintiffs' allegations.[21]

<hr />

[20]*See, e.g.*, Order Dismissing SAC at 7 n.6, Dkt. No. 54 (noting that once Cheng acquired the ASB Loan, he forwarded questions to Dairy Road regarding (A) whether Plaintiffs would have the "capital to pay for the $80k clean up," (B) whether they had the capital "to do a $100k renovation of the store interior," and (C) when Plaintiffs expected to "buy out their partners" (quoting SAC, Ex. 7.4 at 16–17, Dkt. No. 40-11)).  Similarly, Cheng informed Plaintiffs on October 30, 2014 that he would be putting them in touch with his accountant and lawyer in order to "go over all the facts and . . . structures" involved in any potential deal."  Order Dismissing SAC at 8, Dkt. No. 54 (quoting SAC, Ex. 7.1 at 31, Dkt. No. 40-8).  On November 7, 2014, Cheng requested "a bunch of documents from [Plaintiffs] at their earliest convenience" in order to "coordinat[e] the closing with ASB" (Order Dismissing SAC at 8, Dkt. No. 54 (quoting SAC, Ex. 7.4 at 25, Dkt. No. 40-11)), and on November 10, 2014, Cheng followed up with Choi and Garth Nakamura, indicating that nine items were still outstanding (*see* Order Dismissing SAC at 8, Dkt. No. 54 (quoting SAC, Ex. 7.1 at 57, Dkt. No. 40-8)).  In a November 18, 2014 e-mail, Cheng asked Garth Nakamura to provide him with a plan for "Remediation costs," "C Store remodel," and "Status: Buyout of [Dairy Road]" (Order Dismissing SAC at 9, Dkt. No. 54 (quoting SAC, Ex. 7.4 at 33, Dkt. No. 40-11)), and he provided a "counter back to [Plaintiffs]" offering to "Keep present note—we remain as lender only[,]" apparently without any modification, or to "Revise Terms of Note" according to a detailed plan appearing therein (Order Dismissing SAC at 9, Dkt. No. 54 (quoting SAC, Ex. 7.4 at 34–39 [Revision Plan], Dkt. No. 40-11)).  Cheng offered Plaintiffs additional ideas on how to structure any modification in order to "make us both comfortable" on November 19, 2014 (Order Dismissing SAC at 9–10, Dkt. No. 54 (quoting SAC, Ex. 7.4 at 40–41, Dkt. No. 40-11)); on November 24, 2014, he indicated that "[e]verything is open to discussion" (Order Dismissing SAC at 10, Dkt. No. 54 (quoting SAC, Ex. 7.4 at 43, Dkt. No. 40-11)); and when Garth Nakamura shared with Cheng "a future project [his] father [(Nakamura) was] looking into," Cheng responded: "Let's get our deal done first" (SAC at 10, Dkt. No. 54 (quoting SAC, Ex. 7.4 at 48, Dkt. No. 40-11)).

[21]As this Court previously stated:

> Just how these three words [("We are ON")] . . . evidence fraudulent intent, Plaintiffs do not explain.  Read in context, all these words appear to mean is that Cheng had wrapped up the ASB Loan purchase and would be turning his attention to attempting to reach a second deal—this time, with Defendants—to modify their loan.  There is nothing misleading or fraudulent about that because that is precisely what Plaintiffs' voluminous record demonstrates Cheng did.

Order Dismissing SAC at 31, Dkt. No. 54.

Second, Plaintiffs rely heavily on Cheng's December 10, 2014 email to Choi entitled, "Nakamura Settlement Offer," which spelled out the three possible options for structuring a deal that Plaintiffs quote in the TAC. *See* TAC ¶ 26, Dkt. No. 55; TAC, Ex. F [Options Email], Dkt. No. 55-4 at 28–30. Cheng elaborated on the Options Email just a day later, specifying "some of the non-monetary terms we need on the deal," including: (1) Nakamura "and his partners and the purchasing entity tak[ing] on all liability and indemnif[ying] us from any and all issues including retribution from ASB upon purchase"; (2) Nakamura "produc[ing] a Health Department permit to continue to operate the gas station within 45 days from December 15, 2014 or begin[ning] fully funded remediation within 30 days from December 15"; and (3) Nakamura "start[ing] renovation on the store with a fully funded budget, plans we approve asap but not later than 60 days after December 15, 2014." Cheng also clearly stated the potential consequences if Plaintiffs failed to satisfy these non-monetary terms:

> If [Nakamura] fails to do any or all of the above, he can still buy us out at whatever price we allow him on the proposal before us but he will have to do so within 15 days from the last default date from items 1, 2, or 3 above *or we foreclose and he voluntarily agrees to a friendly foreclosure and deeds the properties to us.*

Order Dismissing SAC at 12, Dkt. No. 54 (emphasis added) (quoting Ex. 7.4 at 54, Dkt. No. 40-11). Additionally, the Options Email clearly states: "If you do not want to make a deal, we will go immediately to foreclosure. We will sell to the

highest bidder at the auction. If no one comes, then we will keep it and hire someone to run the operations." SAC, Ex. E, Dkt. No. 55-4 at 29. This correspondence illustrates at least three things: first, that Cheng did provide loan modification options, contrary to Plaintiffs' fraud claim assertion that he did not; second, that the loan modification negotiations were in flux and that an actual agreement was far from a done deal, contrary to Plaintiffs' fraud claim assertions; and third, that environmental issues were of material concern to Cheng throughout the negotiations, once again, contrary to Plaintiffs' fraud claim assertions.

Third, although the Plaintiffs contend that "[t]he agreement between the parties . . . was further memorialized in a series of written drafts prepared by Cheng's side," including "a very detailed 'Term Sheet and Letter of Intent' . . . and a 'First Loan Modification Agreement'" (*see* TAC ¶ 24 (citing TAC, Ex. C [Term Sheet & LOI], Dkt. No. 55-4 at 4–6; TAC, Ex. D [First Loan Modification Agreement], Dkt. No. 55-4 at 7–25)), SAC Exhibit 7 contains emails that contradict Plaintiffs' contention that "it was not a question of whether the parties could reach an agreement, but merely which alternative Nakamura and [Dairy Road] would accept[.]" TAC ¶ 24, Dkt. No. 54. Indeed, the December 15, 2014 message to which the Term Sheet & LOI was attached came from *Choi* and represented his—and not Cheng's—draft proposal or term sheet. *See* Order Dismissing SAC at 12, Dkt. No. 54 (citing SAC, Ex. 7.1 at 70–72, Dkt. No. 40-8);

39

*cf.* Order Dismissing SAC at 12, Dkt. No. 54 (noting that Choi sent Cheng a December 19, 2014 e-mail stating, "I think the ball is in your court?" (quoting SAC, Ex. 7.1 at 76, Dkt. No. 40-8)).

Additionally, the day before the draft Loan Modification Agreement was circulated, Choi circulated what he referred to as a "proposed final term sheet." Order Dismissing SAC at 12, Dkt. No. 54 (quoting SAC, Ex. 7.4 at 57–58, Dkt. No. 40-11). In response, Barbieri noted that there were "[a] few things, all of which we will need to get worked out before the loan modification agreement goes into effect." Order Dismissing SAC at 13, Dkt. No. 54 (quoting SAC, Ex. 7.2 at 9, Dkt. No. 40-9). *Then*, "[n]otwithstanding these outstanding items," Barbieri sent the draft loan modification agreement that appears in TAC Exhibit J (Dkt. No. 55-5 at 21–22) to Choi, which was both unsigned and undated. Order Dismissing SAC at 13, Dkt. No. 54 (citing SAC, Ex. 7.2 at 20, 23–40, Dkt. No. 40-9).[22] The draft documents themselves, in other words, do not stand for the propositions Plaintiffs offer. *See* Mem. in Supp. of MTD the TAC at 13–15, 16–17, 24–26, Dkt. No. 56-1.

Fourth, Plaintiffs contend that Barbieri's two-word question—"What option?"—in a December 29, 2014 email exchange with Choi demonstrates

---

[22]There is no evidence or even allegation that these outstanding items were ever resolved, or that the draft loan modification agreement was ever signed.

Cheng's fraudulent intent. TAC ¶ 29, Dkt. No. 55 ("On December 29, 2014, when Choi, for instance, inquired of Barbieri as to Nakamura's deal with Cheng, he inconsistently emailed Choi back: "What option?"— making it clear that Cheng had never intended to go forward with his promises to Nakamura . . . ."). Aside from offering that email without its surrounding "thread," the TAC asserts identical facts on this point as the SAC. *Compare* SAC ¶ 28, Dkt. No. 55, *with* TAC ¶ 29, Dkt. No. 55. The Court has already explained why Plaintiffs' own evidence forecloses this argument:

> Plaintiffs read much from nothing. Barbieri's email was a response to Choi's request for a copy of an unspecified "option." SAC, Ex. 7.2 at 53–54, Dkt. No. 40-9. Why Choi (*not* Barbieri) even used the term "option" is not clear, since he later clarified that the document he wanted was the Cheng–ASB agreement to purchase Defendants' loan. *Id.* In other words, the December 29 email exchange had nothing to do with Cheng's December 10 buyback proposal. And even if it had, how it evidences fraudulent intent on the part of Defendants is a mystery.

Order Dismissing SAC at 31–32, Dkt. No. 54; *see also id.* at 13 (quoting the message thread in greater detail). Plaintiffs have offered nothing in their latest pleadings to convince the Court otherwise.

Fifth, the record still contradicts Plaintiffs' assertion that Cheng never intended to work out a new loan with Plaintiffs, as allegedly demonstrated by Defendants injecting "new" environmental remediation and other non-monetary prerequisites into the deal at the eleventh hour. TAC ¶ 26, Dkt. No. 55. According

to Plaintiffs, "Cheng's early inquiries about environmental contamination at the site were put to rest at the time when Cheng bought the ASB mortgage as a result of insurance coverage disclosed to Cheng, as set forth in Exhibit "H", as a result of which he bought the property at auction anyway." TAC ¶ 32, Dkt. No. 55. Thereafter, Plaintiffs assert, Cheng had no reason to be concerned with the environmental contamination associated with the gas station operations on the property, and his decision to reassert those concerns as part of the loan modification agreement negotiations shows that he never intended to go through with the deal.

However, as noted by Defendants (Mem. in Supp. of MTD the TAC at 14–15, Dkt. No. 56-1), the insurance cited by Plaintiffs was actually a Reservation of Rights letter. In addition to requesting more information about on-site pollution releases and tank integrity tests, the letter states that the insurance would only cover pollution "resultant from a release of the contents from any covered storage tank system." TAC, Ex. H, Dkt. No. 55-4 at 41. Such conditional coverage hardly represents the guarantee that might have made Cheng's environmental concerns evaporate. *See* TAC ¶ 41, Dkt. No. 55 (asserting that Defendants were "fully aware that the property was fully protected by insurance").

Finally, the only other new *facts* that Plaintiffs introduce in the TAC—regarding a luncheon meeting when "[t]he entire episode with Cheng and the

42

Plaintiffs began" (TAC ¶¶ 35–39, Dkt. No. 55)—similarly fail to support a claim for fraudulent intent. Indeed, as Defendants have noted (Mem. in Supp. of MTD the TAC at 3–4, Dkt. No. 59), the purported misrepresentations at that luncheon meeting are the same as the alleged false promises pled elsewhere in the TAC (and in the SAC before it), which this Court has already addressed (Order Dismissing SAC at 27–28, Dkt. No. 54 (citing *Courter*, 2013 WL 2468360 at *9; *HonFed*, 753 P.2d at 813)).

Plaintiffs, in short, have offered nothing beyond conclusory statements that "Cheng had only intended to take advantage of [Dairy Road] and Nakamura from the beginning of their negotiations" and "had never intended to go forward with his promises to Nakamura." TAC ¶¶ 28–29, Dkt. No. 55. Those conclusory statements are not only not supported by the record, but, in many cases, they are contradicted by Plaintiffs' exhibits to the TAC, as well as by the exhibits Plaintiffs previously attached to the SAC. *Stahl*, 587 P.2d at 1213–14 ("[T]he record is absolutely bare as to any evidence to show whether the [defendant] had any knowledge of or knew at the time when the [subject] representations were communicated by [defendant] that they were false . . . . ").

Accordingly, Plaintiffs' claim for fraud/misrepresentation is DISMISSED.

## III.  **Leave To Amend Is Denied**.

"[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss & Liehe*, 911 F.2d at 247 (citing *Bonanno*, 309 F.2d at 322; *Erlich*, 352 F.2d at 122)).  *See generally Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").  Just as before, the Court's decision on amendment of Plaintiffs' claim turns on futility.  *See* Order Dismissing SAC at 49–51, Dkt. No. 54.

Amendment is futile where the proposed claims are duplicative of existing claims, patently frivolous, and/or legally insufficient.  *See Miller v. Rykoff-Sexton*, 845 F.2d 209, 214 (9th Cir. 1988), *abrogated in other part by Iqbal*, 556 U.S. at 678.  Claims may also be futile where their defeat on any future summary judgment motion is inevitable.  *Johnson v. American Airlines, Inc.*, 834 F.2d 721, 274 (9th Cir. 1987) (denying leave to amend, stating that "courts have discretion to deny leave to amend a complaint for 'futility,' and futility includes the inevitability of a claim's defeat on summary judgment" (citations omitted)); *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 766 (9th Cir. 1986) ("[A]ny amendment would have been futile in that it could be defeated on a motion for summary judgment[.]").  Here, any future summary judgment motion would undoubtedly

include the voluminous record of e-mail correspondence between the parties, the contents of which, as previously noted, squarely contradict Dairy Road's fraud/ misrepresentation claims in the TAC and the basic assumptions underlying them (*e.g.,* that there was a binding contract between the parties, etc). *See Sprewell*, 266 F.3d at 988 ("[T]he court need not . . . assume that allegations contradicted by the exhibits attached to the complaint are true."); *Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) (citing *Ott v. Home Savings & Loan Ass'n*, 265 F.2d 643, 646 n. 1 (9th Cir. 1958)); *see also Iqbal*, 556 U.S. at 678; *Starr*, 652 F.3d at 1216. As such, and because Plaintiffs have previously been afforded the opportunity to amend their claims, without success, it is evident that any further opportunity to amend would be futile. *Johnson*, 834 F.2d at 274; *Gabrielson*, 785 F.2d at 766.

Leave to amend is therefore DENIED. *See Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) ("If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), [FRCP], reveals facts which foreclose recovery as a matter of law, dismissal is appropriate.") (citing *Jacksonville Newspaper Printing Pressmen & Assistants' Union No. 57 v. Florida Publ'g Co.*, 468 F.2d 824 (5th Cir. 1972), *cert. denied* 411 U.S. 906 (1973)); *see also Cook, Perkiss & Liehe*, 911 F.2d at 247 (citing *Bonanno*, 309 F.2d at 322; *Erlich*, 352 F.2d at 122)); *Bonin*, 59 F.3d at 845.

## CONCLUSION

The Court hereby GRANTS Defendants' Motion to Dismiss (Dkt. No. 56) the Third Amended Complaint (Dkt. No. 55). Plaintiffs' TAC is DISMISSED WITHOUT LEAVE TO AMEND.

IT IS SO ORDERED.

DATED: August 16, 2018 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge

*Dairy Road Partners v. Maui Gas Ventures LLC*, CIV. NO. 16-00611 DKW-KJM,
**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND**

46